### TURNBULL and others *v.* CITIZENS' BANK OF LOUISIANA.

*(Circuit Court, E. D. Louisiana.* February, 1883.

1. **USAGE—CHARTER-PARTY.**
   Evidence of usage is admissible to explain what is ambiguous in a charter-party, but is inadmissible to vary or contradict what is plain.
2. **CHARTER-PARTY—DELIVERY OF CARGO.**
   Where the contract declares that the consignees are to take the cargo "from along-side," that means that it is to be taken from where the ordinary appliances of the ship would leave it in discharging,—"at the end of the ship's tackle," on a wharf, if the ship was discharging at a wharf; on a lighter, if the ship could not reach a wharf and was discharging in the stream.
3. **SAME—IMPOSSIBLE CONDITION.**
   Where the liability of the vessel is limited by a condition impossible of execution, such condition becomes nugatory, the same as not written, and the general liability of carriers for the non-delivery of freight attaches.
   See *Turnbull* v. *Blocks of Marble,* 9 FED. REP. 320.

Admiralty Appeal.

*E. W. Huntington* and *Horace L. Dufour,* for libelants.

*M. M. Cohen* and *A. Pitot,* for defendants.

PARDEE, J. Libel *in personam* for balance of freight and for charges. Cross-libel for short delivery. Bill of lading on the Fifeshire, from Glasgow to New Orleans, for 117 tons of pig iron in the usual form, with the following added:

"The said master hereby acknowledging having received the full weight of iron herein specified, the same having been weighed along-side at shipment, and holding himself and the said vessel bound to deliver the same weight of iron, provided it be weighed along-side at discharging. No iron to be retained by the vessel. The pig iron to be taken from along-side and discharged at the rate of 250 tons per running day, (Sundays excepted,) or demurrage to be paid at the rate of 25 pounds sterling per day."

At this port (New Orleans) the iron could not be unloaded and piled on the wharf on account of wharf regulations prohibiting it, so that the ship was obliged to have it trucked across the wharf to *terra*

*Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

*firma,* where it was weighed by the customs officers, and found to be some 13 tons short. The cost of the trucking was $11.70. During the unloading and up to the weighing, both the government and the consignees had watchmen employed to watch the iron.

The testimony of the chief officer of the Fifeshire is to the effect that he superintended the loading and unloading of the cargo; that all the 117 lot taken aboard was put out; that the vessel had two other large lots of iron aboard in different holds, and that the 117 lot was separated from the other iron with wood and mats; that he was very particular about keeping the lots separate, because it was a small lot.

The first question to be decided is as to the liability of the consignees for the charge of trucking the iron across the wooden wharf. The contract specifies that the iron was to be taken from along-side. Unless this has a meaning outside of the plain signification of the words used, the expense of moving the iron over the wharf to land would fall on the consignees. They seek to avoid liability by showing that they could not take the iron until it was weighed, and that it "could not be weighed along-side the ship when it had been discharged." This, of course, goes for nothing as against the contract of the parties as to where the ship's carriage should cease.

The consignees also urge a custom of the port, as sworn to in these terms:

"The term 'taken from along-side,' in its general acceptation with merchants here, does not mean that the merchant is to take it from within a foot or two of the ship, but that the ship is to deliver on the earth-work, as is customary at this port."

The same witnesses say further:

"The term 'along-side' has ordinarily been construed here to mean delivery at this port; and as the custom-house authorities require that the cargo shall be delivered on *terra firma,* and as the wharfmaster always insists that the wharf property cannot be jeopardized by the delivery of any heavy weights on the wood-work, the delivery on the earth-work has almost always been customary."

Again:

"According to the custom of this port, without presuming to say anything as to the law on the subject, it was the business of the ship to deliver that iron where the custom-house authorities designated."

Conceding such a custom as is described in the testimony of these witnesses to have been proved, it is sufficient to say that (a) it is not reasonable, for the customs authorities might designate a particular

pair of scales, or a particular warehouse, for the government weighing; (*b*) custom cannot vary the terms of an unambiguous contract; (*c*) to allow such a custom to come in where the parties have specified that the cargo "is to be taken from along-side," would be to render nugatory such clause.   Under the general law, in the absence of a special contract, the carrier could have been required to do no more than consignees claim in this case.   See *The Tybee*, 1 Wood, 361; *Dibble* v. *Morgan*, Id. 409; and cases cited in Desty, Shipp. § 244.

The learned proctors for consignees rely upon the case of *The Delaware*, 14 Wall. 603, where it is said: "Evidence of usage is admissible in mercantile contracts to prove that the words in which the contract is expressed in the particular trade to which the contract refers are used in a particular sense, and different from the sense which they ordinarily import;" but they should have read the next sentence: "Such evidence may be introduced to explain what is ambiguous, but it is never admissible to vary or contradict what is plain."

The contract in this case was that the consignees should take the iron "from along-side."   That undoubtedly and plainly means that they were to take it from where the ordinary appliances of the ship would leave it in discharging,—"at the end of the ship's tackle," on the wharf, if the ship was discharging at a wharf; on a lighter, if the ship could not reach a wharf and was discharging in the stream.

The next question is about the responsibility for short delivery. The bill of lading *supra* leaves no doubt as to the quantity of iron received.   The government weigher's certificates leave no doubt as to the quantity of iron received by the consignees.   There is no reason to suppose that the ship delivered more than the consignees received. No matter where the technical delivery took place, the actual delivery was on the earth-work.   The ship undertook to put the iron there, did so, and has brought her bill for the expense.   To assume that from the "end of the ship's tackle" to the earth-work some of the iron was lost, is a gratuitous assumption, wholly unsupported by the evidence.   It is equally idle to suppose that while the iron was watched before weighing it was carried off.   It seems to me much more probable that, in spite of the efforts of the chief officer to keep the three lots of iron aboard the Fifeshire separate, the said lots did get mixed, and that 14 tons of the 117 lot were never delivered.   The stipulation in the bill of lading, "holding himself and the said vessel bound to deliver the same weight of iron, provided it be weighed along-side at discharging," might have controlled the ship's liability had it been

possible to have weighed the iron along-side. It was not possible to so weigh the iron, and therefore that clause became nugatory,—the same as not written,—and the general liability of carriers for the non-delivery of freight attached.

Under the evidence there can be no doubt of the short delivery on the 117 tons of iron. Whether it was not all put aboard, whether it was lost on the voyage, whether it was all discharged, whether it was lost after discharging and before delivery on the earth-work, or whether the ship has some other valid excuse, it is incumbent on the ship's owners to show. Non-delivery of the goods shipped by a common carrier makes a *prima facie* case of liability against the carrier. This liability is not avoided by the evidence in this case.

The libelants should recover the balance due for freight, $269.80, and the charges for trucking the iron, $11.70, but from this amount should be deducted the agreed value of the iron not delivered, $269.80, and this leaves a judgment for libelants of $11.70 cents on the whole case. The libelants should pay the costs of this court, and the respondents those of the district court. So ordered