### EVANS v. BLAIR.

(Circuit Court of Appeals, First Circuit. March 4, 1902.)

#### No. 420.

1. SHIPPING—CONSTRUCTION OF BILL OF LADING—RIGHT TO DISCHARGE IN TURN.

A bill of lading, besides the general provision fixing the lay days for discharging, contained a clause providing that the vessel should have precedence in discharging over all vessels arriving or giving notice after her arrival, and should be compensated in demurrage for any violation of such provision. *Held*, that the provision for demurrage for a delay caused by a failure to discharge the vessel in her turn controlled the provision fixing the time allowed for lay days.

2. SAME—PRIVILEGE OF DESIGNATING DOCK.

There being no provision in the bill of lading on the subject, the consignee had, under the custom of most or all of the Atlantic ports, and in view of the particular kind of cargo, the privilege of determining at which of its docks the vessel should discharge, and her right to her turn was limited to such dock. This privilege, however, was not absolute; and whether the assigning her to a particular dock, where she was delayed awaiting her turn, while other vessels arriving after her were discharging at the consignee's other docks, rendered the consignee liable to demurrage, depended on whether such assignment was just and reasonable, and based on some reasonable necessity.

**3. SAME—PRECEDENCE IN DISCHARGING.**

Under a provision of a bill of lading for a cargo consigned to a railroad company, giving the vessel the right to be discharged in her turn, the fact that such cargo is owned by the company, while that of another vessel arriving later is merely consigned to its care, to be shipped over its road, does not entitle the company to give the latter preference in discharging.

Appeal from the District Court of the United States for the District of Maine.

David W. Snow (Symonds, Snow, Cook & Hutchinson, on the brief), for appellant.

Benjamin Thompson, for appellee.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This appeal arises out of a libel for demurrage, filed by the owners of the schooner Augustus Hunt against a cargo of Cumberland coal, shipped from Philadelphia to Portland, Me., and claimed by Mr. Evans in behalf of the Maine Central Railroad Company, its owner, and the real party in interest. The decree of the district court was in favor of the vessel, and Mr. Evans appealed. .

The bill of lading provided that the vessel should have a lien on the cargo for demurrage. The case turns on the application of the following provision contained in it :

"Said vessel shall have precedence in discharging over all vessels arriving or giving notice after her arrival, and for any violation of this provision she shall be compensated in demurrage as if, while delayed by such violation, her discharge had proceeded at the rate of three hundred tons per day."

The bill of lading also provided lay days, to be computed at the rate of one day for every one hundred and fifty tons of coal. The vessel was discharged within the lay days computed at that rate, but, of course, this provision was qualified, and in part overruled, by the stipulation giving her precedence. The vessel claims that the Lewis H. Goward and the John Twohey, which arrived and reported after her, were given before her berths at which she might and should have been discharged.

The three vessels were laden with bituminous coal, but from different mines, and therefore, perhaps, of different qualities and intended for different uses. The Lewis H. Goward was laden with George's Creek Big Vein Cumberland coal, as appears by her bill of lading. This coal did not belong to the Maine Central Railroad Company, and therefore it was consigned to it, to be unladen by it, and transshipped over its rails to its owners. The John Twohey was laden with New River steam coal, also shown by her bill of lading, and which the evidence proves was intended for the passenger locomotives of the Maine Central Railroad Company. The Augustus Hunt was laden with Davis bituminous coal, as also shown by her bill of lading.

The Maine Central Railroad Company controlled three wharves at which coal was discharged,—one its principal place of discharge,

at which about 90 per cent. of its coal was received, being the same at which the Augustus Hunt was unladen; and two others, which are described as "above the bridges," and one of which was used for discharging the Lewis H. Goward, and the other, the upper one, the John Twohey. Under these circumstances, the defenses set up in the answer were that the Augustus Hunt "had on board Davis bituminous coal, intended for the use of the railroad of said Maine Central Railroad Company, and that said Maine Central Railroad Company was then, and had been for a long time, in the habit of discharging coal of this description, intended for the use as aforesaid, upon its pile upon said lower wharf, and nowhere else, and that it had no facilities at any other wharf for discharging schooners loaded with coal as aforesaid; that, according to the terms of the bill of lading under which said cargo was brought, it was optional with said Maine Central Railroad Company to discharge said schooner at said lower wharf or at its wharf above the bridges; that exercising such option, and without delay, said Maine Central Railroad Company ordered said schooner to said lower wharf, and there discharged her;" that "the cargo upon said schooner John Twohey consisted of a different kind of coal from that on the schooner Augustus Hunt, and was not intended to be placed upon the pile at said lower wharf, or for use upon the railroad of said Maine Central Railroad Company in the same manner as the coal upon said schooner Augustus Hunt; and that the discharge of said schooner John Twohey did not in any way interfere with or delay the discharge of said schooner Augustus Hunt."

There is a further defense in connection with the Lewis H. Goward, to which we will refer in its proper connection.

The bill of lading in issue hardly sustains the allegation of the answer that, according to its "terms," it was optional with the consignee to discharge at its lower wharf or at a wharf above the bridges. It is true that, in accordance with the custom at most Atlantic ports, if not at all of them, and also in accordance with the necessities of the case (Davis v. Wallace, 3 Cliff. 123, 130, Fed. Cas. No. 3,657), the Maine Central Railroad Company had, in a general way, the privilege of determining at which of its wharves it should discharge the Augustus Hunt; but in view of the provision in the bill of lading securing to this vessel her turn, and, indeed, without it, it cannot properly be said that this option was an absolute and arbitrary one.

Both parties have cited judicial decisions supposed to elucidate the case; but an examination of them results in giving us no assistance, unless it be found in Stephens v. Macleod, 19 Sess. Cas. (4th Series) 38. Charter parties and bills of lading which provided for loading or discharging an entire cargo at ports where there were several berths for loading or discharging, and which have been under discussion in the English courts, contained the expression, "at any safe berth as ordered," or its equivalent. Murphy v. Coffin, 12 Q. B. Div. 87; Copper Co. v. Morel [1891] 2 Q. B. 647. The result of this class of cases, after some fluctuation, has been to leave the consignee a somewhat unlimited power in the matter of select-

ing the berth, regardless of its crowded state, provided, only, it is a safe one. This, however, comes from the fact that the charter party, or bill of lading, contained express language favorable to the consignee, and from the application of the well-known rule that where, in maritime contracts, parties have seen fit to choose fixed forms of expression, the great variety of contingencies incidental to maritime transactions disenable the courts from establishing any safe theory by which the letter can be modified to meet any supposed intent. In the case at bar, however, there is no such express phraseology, and we are left to work out the construction of the bill of lading as though it provided in effect, in general terms, for a specified number of lay days which the consignee could not exceed, but with also an obligation to give the vessel its turn, even though thereby she is the sooner discharged. Practically, therefore, this case comes down to the mere question whether or not the vessel was given her turn, subject to whatever customs or necessities existed at the port of discharge which might be fairly within the contemplation of both parties.

As we have already said, the custom at most Atlantic ports, including, undoubtedly, the port of Portland, gave the Maine Central Railroad Company, in a general way, the privilege of determining at which of its wharves it should discharge the Augustus Hunt, leaving the vessel to be satisfied if she received her turn at that wharf, provided the lay days expressly limited in the bill of lading were not exceeded. As we have already said, this privilege which the Maine Central Railroad Company had of selecting the berth at which the vessel should be discharged did not come from any express stipulation, as in the English cases to which we have referred, but from the general rules which necessarily govern the relations of the parties. When the law itself attaches to a contract conditions beyond those expressed by the parties, and attaches them because some conditions beyond those expressed are essential to practically work out what the parties have undertaken to accomplish, the conditions thus attached will be just and reasonable. This is a universal rule, applicable alike to contracts at the common law and to those relating to maritime affairs.

Therefore, in the present case, as the entire cargo belonged to the Maine Central Railroad Company, and was deliverable to it, and as the bill of lading failed to point out the specific wharf or berth at which it was to be discharged, the consignee had a privilege of selecting the place of discharge, and the vessel's right to precedence, or, what is the same thing, her turn, was subject thereto. Nevertheless, as we have already said, this did not give the Maine Central Railroad Company an arbitrary right, but only one which was just and reasonable. As well said by Lord Esher, the master of the rolls, in Carlton S. S. Co. v. Castle Mail Packets Co. [1897] 2 Q. B. 485, 490, although in a different connection, this "is a power given to the charterers for business reasons."

While the three vessels named in this case were each laden with bituminous coal, yet bituminous coal is of great varieties, and has so many different uses that the mere fact that they were all so

laden does not of itself fix their right to a turn at a particular wharf other than if one was laden with coal, the second with flour, and the third with sugar. The limitations of the rule applicable to this case are very well shadowed out, on the one hand, in Stephens v. Macleod, already referred to, which is well summed up in Carv. Carr. by Sea (3d Ed.) 708, 709, and by the observations of Chief Justice Jervis in Leidemann v. Schultz, found in the work entitled, with a certain degree of liberality, Abbott's Merchant Ships and Seamen (14th Ed.) 411. In Stephens v. Macleod, the Cassia, which was the vessel in question, having arrived at the port of Portugalete, and being thus outside of the words "as ordered," was entitled to be berthed in turn. There being several wharves for loading iron ore, which was to be her cargo, and the case showing no particular reason to the contrary, she was held to have been entitled to be berthed at the first wharf which was open for her. On the other hand, in the case in which Chief Justice Jervis made the remark referred to, it appeared that the delay arose from the vessel being directed, at Newcastle, to load coke at a particular spout. It was contended for her owner that she could have been loaded earlier at another spout. To this Chief Justice Jervis answered: "Yes; but with different coke and at a higher price. If the captain may choose at what spout he will load, he may next choose what articles he will load with." So far as we can discover, there are no authorities of weight inconsistent with these expressions on the one hand and on the other. They practically illustrate the remark of Lord Esher, that the power given charterers to select a berth is for business reasons. They, therefore, further illustrate that, where several vessels are to load or discharge cargoes of the same generic class, they are apparently entitled, in their turn, to the first berths available, but that it may be shown that the particular circumstances are such as reasonably justify the consignee in directing otherwise.

The result of all this is to sustain, as a mere matter of law, the defense set up in the answer, aside from its reference to the "terms" of the bill of lading of which we have spoken. Coming back to the pith of the answer, that, while the Augustus Hunt was laden with bituminous coal, yet it was of that character which could properly be discharged only at the wharf where the consignee's business was ordinarily transacted, and that the cargo per the John Twohey was of a different class of coal, which could not be availed of at the berth to which the Augustus Hunt was ordered: This is explained by some evidence tending to show that the cargo per the Twohey was exclusively for the use of passenger locomotives, and was discharged at the berth at which that class of coal, and only that class, was discharged, while the cargo of the Hunt was essentially of a different class, not used on passenger locomotives, but for general purposes, and therefore properly discharged at the wharf where the Maine Central Railroad Company discharged all its coal, aside, only, from a small percentage of an exceptional character. It would not be reasonable to so far limit the option which the consignee had with reference to the berth to which the Augustus Hunt was to be ordered as to compel a reversal of its order of business, regard-

less of the precise character of the cargo with which the vessel was laden. Therefore, the answer, in view of these suggestions, shadows out what would have been a proper and reasonable justification for all refusals to order the Augustus Hunt to the berth at which the John Twohey was discharged; but, in the view of the learned district judge, the proofs fail to come up to its allegations. He observed that there is nothing to indicate that it was impracticable to give the Hunt one of the vacant berths without so much delay, and "that the evidence does not show that there was anything in the character of her cargo which made it impracticable to put it upon those berths which were vacant." A careful examination of the record leaves us strongly of the opinion that, if we should announce a different result from that reached by the learned district judge, we could not satisfy ourselves that we were probably any more in the right than he. Only one witness was called for the claimant. At some points in his testimony he stated impressions that the cargo of the John Twohey was for passenger locomotives, and was discharged at the wharf where such coal, and only that class of coal, was discharged, while the cargo of the Augustus Hunt was of the character which we have stated. On the other hand, he also stated as follows:

"Q. What kind of coal did the Twohey have on board? A. New River coal. Q. For what was that coal intended? A. That went over to Thompson's Point. The passenger locomotives' coal is put over there. Q. That is a different purpose than what the cargo of the Augustus Hunt was intended for? A. No; practically the same purpose. It was for locomotive use; all of it. Q. It was your custom to keep separate the different kinds of coal? A. To a certain extent."

Again he said, replying to a question referring to the cargo of the Augustus Hunt:

"Q. Was any of it put into the same pile with the Twohey's coal? A. I cannot say; I do not recollect the whole distribution. There might possibly have been a few cars put in there."

Again he testified:

"Q. When you are rushed with vessels,—that is, when you have a large number,—you then discharge at both of those wharves without any regard to the class of coal? A. We do at times; yes, sir."

"Q. In discharging vessels with soft coal, do you never put different kinds of coal upon the same wharf,—the same pile? A. Yes, sir; I presume it is done at times. Q. You do sometimes? A. Yes, sir. Q. What I want to know is, if you sometimes mingle in piles, or in trains of cars, coal of different character, as, in this case, the Davis coal and Cumberland coal? A. Different kinds of coal go into piles; I don't know just how many different kinds. Q. If they were all steam coal, they would go in? A. Naturally. Some coal is better than others, and some, of course, is different from others, and used for different purposes."

Referring to the use of the lower wharf, he also testified:

"Q. Was that use influenced at all by its convenience and accessibility? A. That was why it was done,—on account of convenience. Q. And not on account of the character of the coal? A. Well, there is more or less difference in coal, as I said before, and it is kept separate to a certain extent. The passenger coal we send over to Thompson's Point. Q. Is the passenger coal of an entirely different character from either of these? A. I am not well enough acquainted with coal to tell."

Without commenting in detail on this evidence, it is entirely plain that it is not of a character which enables the court to determine that the burden of disclosing a reasonable business necessity for delaying the Augustus Hunt, which the answer properly assumes, has been sustained.

This leaves the matter of the Lewis H. Goward, which the answer puts in a somewhat different position. As to her, it says "that said schooner L. H. Goward was not consigned to these claimants or either of them; that she had on board George's Creek Big Vein Cumberland coal, intended for the Phillips & Rangeley Lakes Railroad Company and the Bates Manufacturing Company, and not intended for these claimants or either of them; and that said schooner Augustus Hunt was not delayed in any way by the discharge of said schooner L. H. Goward, as aforesaid." The answer is technically correct in alleging that this coal was not consigned to the Maine Central Railroad Company, as it was consigned only to its care, but it was to be discharged by it and shipped over its rails. The district court was entirely right in holding that the mere fact of the ultimate consignment of the cargo would not justify giving her a preference over the Augustus Hunt. By the bills of lading, all the vessels were to be discharged by the Maine Central Railroad Company, and the Hunt was therefore entitled to her turn accordingly, regardless of the ownership of the cargoes.

Some things in the proofs are explanatory of the precise defense intended. The Lewis H. Goward was discharged neither at the wharf at which the bulk of the business of the Maine Central Railroad Company was done, nor at the wharf at Thompson's Point, but at one intervening between them. If the case showed that this wharf was adapted only for coal intended for transshipment by rail to customers of the Maine Central Railroad Company away from the seaboard, and that there were no facilities at that berth for handling cargoes intended for use at Portland, further supplemented by evidence that the cargo of the Augustus Hunt was not intended for transshipment by rail, this, in accordance with the principles we have already stated, would have given the consignee a reasonable ground for sending the Lewis H. Goward there, and not the Augustus Hunt. Here, again, the proofs halt. The claimant's witness testified as follows:

"Q. Coal consigned to you by bill of lading for somebody else you deal with as you do your own coal, so far as discharging is concerned? A. Yes, sir; so far as discharging is concerned, after we get orders from the shippers where they wish it sent."

He also testified:

"Q. As I understand, so far as the wharves are concerned, or so far as the facilities were concerned, and the manner of discharging, it was purely optional with you whether those vessels should be discharged at one berth or the other; and when I say 'those vessels' I mean all three of the vessels,— the Hunt, the Twohey, and the Goward. A. No, sir; not always. Q. I say, so far as those vessels were concerned, in that particular case and time? A. Yes, sir; it was."

"Q. You had the right to assign berths? A. Yes, sir. Q. There was nothing in the condition of the berths which prevented you from assigning where you pleased? A. Not that I am aware of."

· Then comes what we have already said as to the practice of discharging vessels at all the wharves, without regard to the classes of coal, when rushed with cargoes.

He also testified:

"Q. Where was the coal from the Augustus Hunt which was put onto cars carried? A. I think a portion of it went to Vanceboro. Q. Was any of it put into the same pile with the Twohey's coal? A. I cannot say. I do not recollect the whole distribution. There might possibly have been a few cars put in there."

This shows that coal from the Augustus Hunt was discharged upon cars, as was that from the Lewis H. Goward. How much was so discharged, whether a small or a large part, or the whole, is not made to appear; but this evidence certainly leaves a strong impression that not only a part of it was in fact discharged upon cars, but that the whole of it might have been, as was the cargo of the Goward. Here, again, as with reference to the precedence given to the Twohey, while there are, perhaps, expressions enough in the proofs, if they stood alone, to maintain such a distinction between the different classes of coal, constituting the cargoes of the three vessels, as would have justified discrimination in selecting the places of discharge, yet the whole leaves the case in a state of equilibrium, and fails to maintain, by a preponderance thereof, the defense set up in the answer.

The decree of the district court is affirmed, with interest, and the costs of appeal are awarded to the appellee.