## HARDING v. CARGO OF 4,698 TONS OF NEW RIVERS STEAM COAL.

(District Court, D. Maine.   October 15, 1906.)

### No. 35.

1. SHIPPING—CHARTER PARTY—PRINTED AND WRITTEN PROVISIONS.

After the printed provision of a charter party, "Vessel to have turn in loading," was written, "Vessel to be loaded promptly." *Held*, that the latter provision did not nullify nor supersede the former, but that the two were consistent, and both could be given effect.

2. SAME—PROVISION FOR TURN IN LOADING.

A provision of a charter party for a schooner to carry a cargo of coal, "Vessel to have turn in loading," does not make a part of the contract a custom of the port to give steamers the preference in loading or filling their bunkers, which is not shown to have been known to the parties, but entitles the vessel to be loaded in turn with other vessels in the order of their arrival, and she is not obliged to take her turn with any particular class of vessels.

3. SAME—DEMURRAGE.

To avoid liability for demurrage to a vessel chartered to carry a cargo of coal and entitled under the charter party to be loaded in turn, where it is shown that other vessels arriving after her were loaded first, the burden rests on the charterer to clearly prove exceptional conditions or particular circumstances set up as a defense, and which it is claimed rendered it impracticable from a business standpoint to load sooner, as that owing to her height she could not be loaded at the piers where such other vessels were without great additional expense.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, §§ 572, 596.]

4. SAME—PROVISION FOR PROMPT LOADING—COAL CARGO.

Under a charter party for a vessel to carry a cargo of coal, which provided that she should "have turn in loading" and "be loaded promptly," she was entitled to be loaded promptly in view of the facilities of the port and the climatic conditions which existed at the time, and to have such facilities used to their normal capacity, not only in her own loading, but also in the loading of other vessels after her arrival while she was waiting her turn.

In Admiralty.   Suit for demurrage.

Benjamin Thompson, for libelant.

J. Wells Farley and Charles Wolcott, for claimant.

HALE, District Judge.   This is a libel to recover damages for detention of a vessel.   The five-masted schooner Dorothy Palmer, with a carrying capacity of 4,800 tons, one of a large fleet of schooners known as the "Palmer Fleet," was chartered in Boston on the 27th day of January, 1904, for a voyage from Newport News to Portland, with a full cargo of coal.   The charterer and claimant was the Warren & Monks Company, a corporation engaged in the wholesale coal business at Boston.   The charterer had received notice from the New Rivers Consolidated Coal & Coke Company that it could supply it with 30,000 or 40,000 tons of coal per month until April 1, 1905.   By the terms of the charter, the schooner was to be provided with a full and complete cargo of coal and pay for the use of the vessel 75 cents per ton.   The charter party further provided:

"It is agreed that the lay days for loading and discharging shall be as follows: Commencing from the time the captain reports himself ready to receive or discharge cargo and excepting Sundays and national legal holidays unless used. Vessel to have turn in loading. Vessel to be loaded promptly."

The above provision was all in print, except the last sentence, namely, "Vessel to be loaded promptly," which was written below the printed part, in a blank space. The charter provided also:

"That for each and every day's detention by default of such charterer six cents per ton B. L. weight per day, day by day, shall be paid by said party of the second part [the charterer], or agent, to said party of the first part [the vessel], or agent. The cargo or cargoes to be received and delivered alongside within reach of the vessel's tackles, sufficient water guaranteed. Vessel to have an absolute lien on cargo for freight, dead freight and demurrage. Vessel may assert said lien with cargo still on board."

The schooner arrived at Newport News in the morning of the 12th day of February, 1904. The testimony shows that at Newport News there is no opportunity for coal to be stored. All coal shipped is bituminous, and is run upon cars from the mines to the docks of the Chesapeake & Ohio Railroad Company. It is dumped from the cars into the vessels. The company is represented at that port by Henry E. Parker, superintendent of terminals, who has charge of the docking of vessels at the piers, providing berths for them, ordering coal upon the dock, and directing the loading. He determines the place where, and the time when, vessels shall be docked. The railroad company has about 6,000 cars, a great part of which are used for the transportation of coal from the mines. It maintains three piers for the shipping of coal, known as "Pier 2," "Pier 3," and "Pier 10"; all of these piers having berths for vessels on both sides. Loading the vessels is done by gravity; the cars being brought from a low grade, pushed up an incline by a locomotive to the crest of the grade, where they are left by the locomotive, and then moved by hand, with the assistance of gravity, to the end of the pier and unloaded while in transit. At intervals along the tracks are pockets located under the track and connected near the edge of the pier with long metal chutes. Connection between the pocket and the chute is jointed, so that the chute may be raised or lowered to accommodate the height of the vessel to be loaded. By the use of these facilities, as the evidence shows, the maximum loading at that port is 325,000 tons per month, and, under normal conditions, about 10,000 tons per day are ordinarily loaded at the three piers. The testimony shows further that, during the time the schooner was waiting for cargo, the shipment of coal was normal, and there was no shortage of cars or track facilities.

All coal vessels arriving at Newport News anchor in the roadstead, from which point they are taken by steam tugs of the Chesapeake & Ohio Railroad Company and docked at the particular coal pier at which the superintendent of terminals determines to load them. The masters of such vessels do not have anything to say about the docking, but, after reporting, wait until a tug is sent. Upon her arrival at Newport News, the libelant's vessel anchored at the usual anchorage and reported to Mr. Parker, and also to Mr. Arnal, the charterer's agent. At the time of her arrival there were 20 or more coal vessels at anchor

in the harbor. These were, for the most part, schooners, and a few barges, waiting for cargo. The Palmer remained at her anchorage in the stream from the date of her arrival on February 12th until February 26th. The evidence shows that during all that time she was in readiness to be docked and to receive her cargo, and Mr. Parker testifies that, when a vessel comes into Newport News harbor and lets her anchor go, she is entitled to count her time from that moment, so that no question is raised but that the Dorothy Palmer, on and after February 12th, was an "arrived vessel," within the meaning of the charter party. At about noontime on February 26th the schooner was docked by direction of Mr. Parker at berth 9 of pier 10. Capt. Harding, her master, testifies that she received cargo right along every day up to March 2d, and on that day the coal supply ran short, and she was hauled into the stream; that on the following day, March 3d, she was docked at pier 3, where she remained until March 5th, when her loading was completed. The claimant admits liability for the delay incident to the shortage of coal on March 2d, and, to cover the detention from that time until March 5th, it has paid into the registry of the court the sum of $850, but denies that it is liable for any further detention.

The first question in the case relates to the construction which the court shall give to the provisions of the charter, "Vessel to have turn in loading," and. "Vessel to be loaded promptly."

1. It is claimed by the libelant that the insertion into the printed charter party of the written words, "Vessel to be loaded promptly," supersedes the printed portion, "Vessel to have turn in loading," and that thus, under the terms of the charter party, the schooner should have been loaded promptly without any regard to the question of turn. The learned counsel for the libelant cites the class of cases where, in contracts which present great difficulty of construction, courts have disregarded printed portions which were inconsistent with inserted written clauses, and have permitted the written words to master the rest of the printed blank. He cites many important and leading cases, some of them in this circuit, where this position has been sustained, and urges that, under this class of decisions, the written portion of the charter party should be given the controlling weight; that the vessel should have been loaded as soon as she came to Newport News, without any regard to the loading of other vessels; and that the charterer was obliged to have cargo ready for shipment upon the arrival of the schooner at Newport News, or immediately thereafter. I cannot give this interpretation to the two expressions in the charter party. The principle of construction invoked by the learned counsel for the libelant is resorted to by courts upon questions where there is an irreconcilable conflict between two provisions in a contract; but this method of interpretation is not, and should not be, followed where a reasonable construction may be given, which gives force to every term and provision of the contract, and is, at the same time, consistent with law and with the intention of the parties. The India, 49 Fed. 76, 1 C. C. A. 174; Miller v. Hannibal & St. Jo. R. R., 90 N. Y. 430, 43 Am. Rep. 179; Bell v. Woodward, 46 N. H. 315.

2. In order to find what the two expressions in the charter party mean, when taken together, it is necessary to find what is the meaning of the clause: "Vessel to have turn in loading."

The learned counsel for the claimant insists that this clause should be interpreted to mean that the vessel is to have turn in loading according to the custom of the port of Newport News. Under this construction, the claimant seeks to read into the contract a usage of the port that all sailing vessels shall be berthed in the order in which they arrive; but that preference shall be given to steamers whether they require coal for cargo or for bunker use.

In Donnell v. Amoskeag Manufacturing Co., 118 Fed. 10, 14, 55 C. C. A. 178, 182, in speaking for the Circuit Court of Appeals in this circuit, Judge Putnam said:

"We will find, therefore, that, so far as the expression 'in turn' is concerned, we must follow a strict construction; but, as to any question of usage at the place of loading, we must apply just and reasonable rules. * * * We will now proceed to look at the effect of the expression 'in turn.' The learned judge who disposed of the case in the District Court found that this stipulation had been violated in two particulars: By giving precedence, first, to two steamers belonging to the Consolidation Coal Company, and, second, to certain local demand for steamers for bunker consumption, for street railways, and perhaps for other local purposes. On this branch of the case, we are met by an express stipulation in the charter party which is not to be lightly put aside. If it were intended that preferences of these kinds should be given, it was easy to so stipulate in the charter party, and it should have been done. It was apparently usual for the Consolidation Coal Company to give priorities of this character. but this does not relieve the position. * * * From the very nature of the usage, no limit can be put on it, so that to refuse this vessel the full benefit of the. expression 'in turn' would expose her to an indefinite detention at the port of loading, without any rule by which the detention could be measured in advance, and without any relief. The authorities cited by one party or the other which are supposed to bear directly on this question are contradictory. None are of conclusive weight, and they are differently understood by different writers. Scrutton, Charter Parties (4th Ed.) 96, 97, Carv. Carr. at Sea (3d Ed.) 708, 709; Abb. Merchant Ships & Seamen, (14th Ed.) 410, 411. In Evans v. Blair, 114 Fed. 616, 620, 52 C. C. A. 396, we pointed out under what limitations some of the expressions in the cases thus cited may be safely applied. On the whole nothing would be gained by our undertaking to discuss them. What we have already said, however, is in the line of what was well observed by Martin, B., in Lawson v. Burness, 1 Hurl. & C., 396, 402. In that case it was claimed that the expression 'regular turn' in a charter party was to be construed as subject to the custom of the colliery where the vessel was to be loaded, by virtue of which custom vessels were loaded in the order in which they were entered on the books of the colliery, and not in the order in which they reported. Martin. B., observed: 'I cannot conceive anything more unreasonable than that, where two persons enter into a charter party by which a vessel is to load in regular turn, vessels which come in after it should load before it, because, by the practice of the colliery, vessels which are entered first in the book, though not ready to load, are loaded before those which are ready.' As well observed in Scrutton, Charter Parties (4th Ed.) 16, such usages 'may control the mode of performance of a contract, but cannot change its intrinsic character'; and to submit this vessel, which had stipulated for a specific right as to the order of being loaded, to usages which leave her no definite rights whatsoever, would be a change of that class."

In Gardiner v. McFarlane, 20 Ct. of Sessions Cases (4th Series) 414, the court held that the clause of the charter party, providing that the ship was to be loaded as customary, referred only to the manner of

loading customary at the port of loading, binding the ship to receive the cargo either by lighter, at the wharf, under a crane, or in any way by which such cargoes are usually or according to custom loaded at the port; and the court said:

"It did not include an obligation to wait a regular turn, and did not affect the time which the charterer might detain the vessel without being liable for demurrage for undue detention, although there was no custom time taken or allowed for loading cargoes."

See, also, Swan v. 550 Tons of Reserve Coal (D. C.) 35 Fed. 307; Stephens v. Macleod, 19 Ct. of Sessions Cases (4th Series) 38.

In Evans v. Blair, 114 Fed. 616, 620, 52 C. C. A. 396, 400, speaking for the Circuit Court of Appeals in this circuit, and commenting on the case which I have last cited, Judge Putnam said:

"The limitations of the rule applicable to this case are very well shadowed out, on the one hand, in Stephens v. Macleod, already referred to, which is well summed up in Carv. Carr. by Sea (3d Ed.) 708, 709, and by the observations of Chief Justice Jervis in Leidemann v. Schultz, found in the work entitled, with a certain degree of liberality, Abbott's Merchant Ships and Seamen (14th Ed.) 411. In Stephens v. Macleod, the Cassia, which was the vessel in question, having arrived at the port of Portugalete, and being thus outside of the words 'as ordered,' was entitled to be berthed in turn. There being several wharves for loading iron ore, which was to be her cargo, and the case showing no particular reason to the contrary, she was held to have been entitled to be berthed at the first wharf which was open for her. On the other hand, in the case in which Chief Justice Jervis made the remark referred to, it appeared that the delay arose from the vessel being directed, at Newcastle, to load coke at a particular spout. It was contended for her owner that she could have been loaded earlier at another spout. To this Chief Justice Jervis answered: 'Yes; but with different coke and, at a higher price. If the captain may choose at what spout he will load, he may next choose what articles he will load with.' So far as we can discover, there are no authorities of weight inconsistent with these expressions on the one hand and on the other. They practically illustrate the remark of Lord Esher that the power given charterers to select a berth is for business reasons. They therefore further illustrate that, where several vessels are to load or discharge cargoes of the same generic class, they are apparently entitled, in their turn, to the first berths available, but that it may be shown that the particular circumstances are such as reasonably justify the consignee in directing otherwise."

When the testimony relating to usage is examined, it will be found that it is not altogether satisfactory. The evidence does not make it clear that any such custom as is asserted by the claimant was known and recognized by both parties to the contract. It falls short of showing that, when the parties contracted, they had in view a distinct custom at the port of loading. It is denied by the libelant that such a custom was known to him or to his agents. It is insisted that, if there had been such a custom, and if it had been known to the parties, such custom would have been mentioned to Capt. Harding, the master of the schooner, and that it would have been made the controlling reason why the vessel was delayed and was not given her turn; whereas, no such reason was given for delay, but the agents for the railroad company stated that coal had not yet arrived.

In Barnard v. Kellogg, 10 Wall. 383, 390, 19 L. Ed. 987, the Supreme Court says:

"The proper office of a custom or usage in trade is to ascertain and explain the meaning and intention of the parties to a contract, whether written or. in parol, which could not be done without the aid of this extrinsic evidence. It does not go beyond this, and is used as a mode of interpretation on the theory that the parties knew of its existence, and contracted with reference to it. It is often employed to explain words or phrases in a contract of doubtful signification, or which may be understood in different senses, according to the subject-matter to which they are applied. But if it be inconsistent with the contract, or expressly or by necessary implication contradicts it, it cannot be received in evidence to affect it. 'Usage,' says Lord Lyndhurst, 'may be admissible to explain what is doubtful. It is never admissible to contradict what is plain.' And it is well settled that usage cannot be allowed to subvert the settled rules of law."

In Merchants' Bank v. State Bank, 10 Wall. 604, 19 L. Ed. 1008, in speaking for the Supreme Court, Judge Clifford said:

"Evidence of usage is admissible in mercantile contracts to prove that the words in which the contract is expressed, in the particular trade to which the contract refers, are used in a particular sense, and different from the sense which they ordinarily import, and it is also admissible in certain cases for the purpose of annexing incidents to the contract in matters upon which the contract is silent; but it is never admissible to make a contract or to add a new element to the terms of a contract previously made by the parties. Such evidence may be introduced to explain what is ambiguous and doubtful, but it is never admissible to vary or contradict what is plain. Where the language employed is technical or ambiguous, such evidence is admitted for the purpose of defining what is uncertain; but it is never properly admitted to alter a general principle or rule of law, nor to make the legal rights or liabilities of the parties other or different from what they are by the common law."

In Partridge v. Insurance Company, 15 Wall. 573, 579, 21 L. Ed. 229, Mr. Justice Miller shows the logical use prevailing in courts on the subject of usage:

"The tendency to establish local and limited usages and customs in the contracts of parties, who had no reference to them when the transactions took place, has gone quite as far as sound policy can justify. It places in the hands of corporations, such as banks, insurance companies, and others, by compelling individuals to comply with rules established for the interests alone of the former, a power of establishing those rules as usage or custom with the force of law. When this is confined to establishing an implied contract, and the knowledge of the usage is brought home to the other party, the evil is not so great. But when it is sought to extend the doctrine beyond this, and incorporate the custom into an express contract whose terms are reduced to writing and. are expressed in language neither technical nor ambiguous, and therefore needing no such aid in its construction, it amounts to establishing the principle that a custom may add to or vary or contradict the well-expressed intention of the parties made in writing. No such extension of the doctrine is consistent either with authority or with the principles which govern the law of contracts."

In Davis v. Wallace, 3 Cliff. 123, Fed Cas. No. 3,657, in speaking for the court, Mr. Justice Clifford said:

"Reference is made by the respondents to the stipulation in the charter party that the cargo 'shall be received and delivered at the ports of loading and discharging as customary.' But it is evident that that clause refers to the manner of receiving and delivering the cargo, and that it has nothing to do with the question under consideration. Where there is no special contract, the usage of the port in respect to the reception and delivery of the cargo, in controversies between the shipowner and the consignee, is frequent-

ly a very material consideration; but demurrage is a matter of contract, and it is well-settled law that usage cannot prevail over or nullify the express provisions of a contract. Proof of usage is admitted either to interpret the meaning of the language of the contract or to ascertain its nature and effect in the absence of express stipulation, and where the meaning is equivocal or obscure; but the proof of usage is not admitted to contradict express stipulations, or to vary the language employed by the parties where their meaning is expressed in plain and unambiguous terms." Marshall v. Perry, 67 Me., 78, 82; Dickinson v. Gay, 7 Allen (Mass.) 29, 83 Am. Dec. 656; Haskins v. Warren, 115 Mass. 514; Collender v. Dinsmore, 55 N. Y. 200, 14 Am. Rep. 224; Randall v. Smith, 63 Me., 105, 18 Am. Rep. 200; The Gazelle and Cargo, 128 U. S. 474, 9 Sup. Ct. 139, 32 L. Ed. 496; Tyson v. Belmont, Fed. Cas. No. 14,316; Isaksson v. Williams (D. C.) 26 Fed. 642; Turnbull v. Citizens' Bank (C. C.) 16 Fed. 145; The Dictator (D. C.) 30 Fed. 637; Nordaas v. Hubbard (D. C.) 48 Fed. 921.

The claimant urges that King v. Hinde, 12 L. R. Ir. 113, supported as it is by Scrutton on Charter Parties, should have great weight with the court in deciding this question; but I cannot think that this case and others of its class can be held to override the rule which is laid down in the cases which I have cited. In view of the evidence in the case, and the law which ought to control it, I am of the opinion that it would be doing a violence to the clause, "Vessel to have turn in loading," if I made that clause to read, "Vessel to have turn in loading according to the usage of the port of Newport News." If it had been the intention of the parties to the contract to import the usage of Newport News into the charter party, they should have said so in the contract. The court is of the opinion, then, that the term "turn in loading" means that the Dorothy Palmer was entitled to be loaded in turn with other vessels, in the order of their arrival, and that she was not obliged to take her turn in loading with any particular class of vessels.

3. Did the Dorothy Palmer have her "turn in loading," as stipulated by the charter party?

The learned counsel for the claimant insists that the schooner did have her "turn." He admits that certain sailing vessels, which arrived after the Dorothy Palmer, were loaded before her at piers 2 and 3, but says that this fact is immaterial, since it was impossible, at least in a business sense, to load the Dorothy Palmer at those piers. He insists that pier 10 was the only pier at Newport News at which it was practicable to load the Dorothy Palmer when light, because the great height of her hatch coamings above the water line made it impossible to obtain an incline to the chute sufficiently steep to cause the coal to run from the hopper to the vessel; that the only method by which it is possible to load coal into this schooner at the other piers, until she has been partially loaded at pier 10, is to shovel the coal down the chutes; and that this method is not practicable, in a business sense, as it would involve indefinite delay in loading her, and would also delay the loading of all vessels behind her.

Particular circumstances and exceptional conditions, similar to these outlined by the charterer, have been accepted as defenses by late decisions of courts in England and America, and have, when proved, been held to relieve the charterer from liability under his contract to have the cargo ready when the vessel is ready.

147 F.—62

In W. K. Niver Coal Co. v. Cheronea S. S. Co. (C. C. A.) 142 Fed. 402, 406, recently decided by the Circuit Court of Appeals in this circuit, in speaking for that court, Judge Putnam says:

"According to the primitive rule, a charterer who agrees to furnish a cargo for a vessel and to discharge it is bound to have the cargo ready when the vessel is ready, and to receive the cargo immediately on its arrival at its port of destination. This primitive rule applies to all contracts concerning the handling of merchandise, alike of sale, transportation, or bailment of any kind; but, within the last century, in view, partly of the necessities of coal ports, and of ports for shipment and receipt of ores and grain, and the modern facilities peculiarly provided at terminals for handling the immense masses of such merchandise now required to be handled, this rule has somewhat yielded, as is fully explained in Scrutton's Charter Parties and Bills of Lading (5th Ed., 1904) 17–22. This has gone so far that this author says, in effect, at pages 259, 260, and 261, that a mere obligation to load or unload imports a stipulation that the work shall be done according to the settled and estab-. lished practice of the port. Mr. Scrutton says, in effect, at page 260, that it has needed a long series of decisions to accomplish this proposition. The same series of decisions has also established the further proposition that, aside from any peculiar custom, the consignee has a right, to a certain extent, to select a particular wharf or berth for discharge of the vessel, although that berth or wharf may be occupied when the vessel is ready to unload, for that reason delaying her; and this not only under charter parties like those now before us containing the words 'as ordered,' but also where neither these words nor an equivalent expression are found. This is not only the settled law in England, but it is the apparent law in the United States. Accordingly, alike with regard to the port of lading and the port of discharge, large margins are given charterers, which have resulted in long detentions to vessels, extremely burdensome, but for which compensation has been refused. As these appeals do not require us to determine positively the modern application of the rules to which we refer, or to fix accurately their various limitations, we will only refer in a general way to the decisions of this court, and to a single English decision which was practically contemporaneous with the peculiar form of charter before us."

This comprehensive opinion of Judge Putnam proceeds to give an exposition of the present law upon the subject, and sustains the finding of the District Court in New Ruperra S. S. Co. v. 2,000 Tons of Coal, 124 Fed. 937, where Judge Lowell bases his decision upon the leading case of Davis v. Wallace, supra, in which case it was held that the charterers were liable for the delay caused by the vessel waiting her turn. The business reasons suggested by Lord Esher and referred to in Evans v. Blair, supra, have led courts in recent decisions to modify what Judge Putnam has called the "primitive rule"; but in Ardan Steamship Co., Ltd., v. Andrew Weir & Co., L. R. App. Cases 1905, 501, it will be seen that the House of Lords indicates a tendency of English courts to return to something like the primitive rule. In the present attitude, however, of English and American law, it is difficult to determine in each case to what extent business reasons are competent matters of defense. In the case at bar it is clear that there was something more than a mere "obligation to load and unload." There was an obligation that the vessel should have her "turn in loading," and I have not allowed the usage of the port to be read into the contract, so far as that usage relates to permitting steamers, bunker or cargo, to take precedence of sailing vessels. It is clear that, in this case, exceptional conditions and particular circumstances cannot be a defense,

unless they are clearly proved. The burden, then, is upon the claimant to satisfy the court that it was impracticable to load the Dorothy Palmer at any other pier than pier 10. The consideration of this subject involves a careful study of the evidence. It is not necessary to review the testimony in detail. It is enough to say that I am of the opinion that the claimant has not met this burden. The preponderance of the evidence seems to me to show that the Dorothy Palmer could have been loaded at piers 2 or 3; that she did not have such height of hatch coamings above the water line as to make it impossible or impracticable for her to load at those piers. Mr. Parker was the leading witness for the claimant on this point. He insisted that, to his knowledge, the Dorothy Palmer could not have been loaded either at pier 2 or 3, and that she could have been loaded only at pier 10. The force of his testimony, however, is very much impaired by the fact that, at the hearing of the case, he declined to allow the vessel to be taken to piers 2 and 3 and to have a physical examination made, to satisfy the court upon this subject, although the vessel, unladen, was then at Newport News, and libelant was ready to have the test made.

Upon a careful examination of the evidence upon this point, the court is satisfied that the Dorothy Palmer could have been loaded at either pier 2 or 3; that she did not have her turn in loading with vessels in the order of their arrival; and therefore that this clause of the charter party was not met by the charterer.

4. Was the vessel loaded promptly?

In approaching this question the court must take into consideration the means of loading at Newport News. The testimony is that this port was in the full use of its facilities at the time of the loading of this vessel. With 60 miles of track and sidings and 6,000 cars, with its ample piers and great gravity system for loading vessels, the port presented the most ample opportunities for vessels seeking cargoes. This vessel was worth $150,000. She had an earning capacity of about $300 per day. She came to this port to avail herself of its great facilities, and she had a right to expect the benefit of them. The freighter, the charterer, "the adventurer who chalks out the voyage," had contracted to give this vessel "prompt loading" at that place. The testimony tends to show, as I have already said, that the maximum loading at these three piers was 325,000 tons per month; that 10,000 tons were ordinarily loaded per day under normal conditions, and Capt. Harding, the master of the schooner, says he has loaded 4,600 or 4,700 tons while his vessel was at the dock for about 27 hours, and that only 15 to 21 hours were actually consumed in the loading; that such loading was not quick loading, but that the average loading of a vessel of the capacity of the Dorothy Palmer was about 2½ days. Mr. Parker states that, under the conditions as they existed at Newport News in February and March, 1904, from three to five days would have been a reasonable time for the loading of this vessel. Under this charter party the libelant's vessel was to be "loaded promptly." As to whether she was so loaded is a question of fact. Upon a careful examination of all the testimony, the court is of the opinion that the charterer's obligation, "Vessel to be loaded promptly," has not been

complied with. Even allowing for the climatic conditions existing at the time of loading, I am of the opinion that this vessel should have been loaded in less time than was consumed in loading her.

The libelant makes the further claim that the term "loaded promptly" should not be limited to the time consumed in loading the Dorothy Palmer after she obtained her loading berth; but that the provision relates, and must be extended so as to apply, to the loading of other vessels which were loaded ahead of the Dorothy Palmer, whether they had previously or subsequently arrived; that she should not suffer by waiting her turn from the fact that these vessels were delayed in their loading, either from want of cargo or from the fact that the Chesapeake & Ohio Railroad Company (which both parties concede became the charterer's agent in the loading of the vessel) failed to utilize its loading facilities to their ordinary and normal capacity—in other words, that the charterer's normal capacity for loading should have been used, not only in loading this vessel, but also in loading the other vessels to which I have alluded, and upon the loading of which she was dependent in obtaining her own prompt loading. There is much force in this contention. The attention of the court has been called by both parties to Elliott v. Lord, 52 L. J., P. C. 23, 48 L. T. 542, 5 Asp. M. C. 63, in which—

"A charter party provided that the ship should proceed to a port, and there load from the factors of the charterers a cargo of coal, 'taking her turn with other steamers,' and receive 'prompt despatch in loading.' The charterers employed the persons at the port of loading who were employed to load other ships, and the ship was loaded in her turn, but, by reason of an insufficient supply of coal, the ship was delayed, and it was held that the charterers were responsible for the delay."

In Abbott's Law of Merchant Shipping (13th Ed.) 297, the author says:

"A contract that a steamer should take her turn with other steamers, and receive prompt dispatch, was held not to be satisfied by merely loading the ship in turn, as she did not receive prompt dispatch, owing to a deficiency in the supply of cargo."

The court is of the opinion that the charterer's covenant to load promptly should not be limited to the period after the Dorothy Palmer obtained her berth. Upon this point, Capt. Harding, the master of the schooner, states—and I do not find that he is contradicted—that Mr. Parker, the superintendent of terminals, told him that there were at that time several vessels waiting in Newport News because there was no cargo for them, and the evidence tends to show that the usual loading facilities of the port were not being used to the extent that they were in use under normal conditions; but to what extent there was a failure in this particular, or how far such failure may have been due to climatic conditions, does not satisfactorily appear. As this particular aspect of the case, however, is one of damages, it will necessarily be heard by an assessor.

Libelant further argues that the evidence shows that the failure of the libelant's schooner to have her turn, as well as the failure to load her promptly, were due to the fact that her cargo was not ready, although

the charterer had requested the New Rivers Coal Company to supply coal; that this failure to have the cargo at the time and place for loading was the real cause for the delay in giving this vessel her turn, and in not loading her promptly; that such reasons were given by the charterer's agent, as also by the superintendent of terminals, on several occasions during the time the schooner was waiting in Newport News; and that the reasons which were made the subject-matter of this defense were pretexts and after-thoughts. There is considerable testimony in the case sustaining the libelant's contention upon this point. It is not, however, incumbent upon the court to decide what reasons prevailed in this behalf. It is enough to find, and I do find, that this vessel was improperly detained.

5. I hold, then, in this case that under the clause, "Vessel to be loaded promptly," the Dorothy Palmer was entitled to have her turn in loading with the other vessels in the order of her arrival, as I have indicated in this opinion, and without reading into the charter party the alleged custom. I further hold that she should have been loaded promptly, in view of the facilities of the port, taking into account the climatic conditions which existed at the time, and that she was not so loaded.

A decree may be entered for the libelant. An assessor may be appointed to report the extent of the libelant's damages.