## DAVIS et al. v. GARFIELD & PROCTOR COAL CO.

(District Court, D. Massachusetts. January 7, 1918.)

### No. 192.

1. SHIPPING ⬅️174—CONSIGNEES—ACCEPTANCE OF CARGO.

Consignees, accepting a cargo of coal under a bill of lading making detailed provisions as to demurrage, are bound by its terms.

2. SHIPPING ⬅️177—DEMURRAGE—BILL OF LADING.

Under a bill of lading establishing a daily rate of discharge, with demurrage if unloading is not completed within time so limited, and doubling rate in case other vessels be given preference, the consignee may direct discharge at a single wharf, or in a specified berth at a large wharf; and the double rate does not apply, if the vessel be given her turn where directed.

3. SHIPPING ⬅️177—DEMURRAGE—PRIORITY IN DISCHARGE.

Where a bill of lading provided for a double rate of demurrage in case later vessels were given preference, a coal-carrying vessel ordered in

---

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

general terms to large docks having several berths, and at which coal for different purposes was unloaded at separate places, takes her place in line for the berth at which coal of the sort which she is carrying is habitually discharged.

4. SHIPPING ⊜⇒172—DEMURRAGE—DOUBLE RATE OF DISCHARGE.

Where a bill .of lading to protect a vessel against discrimination provided for a double rate of discharge in case later vessels were given precedence, the provision, being in the nature of a penalty, is enforced with reference to reasonable business conditions and usages prevailing at the wharf where discharge is directed, and comes into effect only when preference is given out of the usual course of business.

5. SHIPPING ⊜⇒184—DEMURRAGE—BURDEN OF PROOF.

Where a bill of lading provided for double rate of discharge in case a later vessel was given preference, the fact that later vessels are given preference throws on the consignee the burden of justifying such action, and it is not sufficient for it to show that no departure was made from the ordinary business practice, but it must also show that the practice was reasonable.

6. SHIPPING ⊜⇒175—DEMURRAGE—PRIORITY.

For a railroad which owned a dock to reserve discharge towers and prefer vessels carrying its own coal is not unreasonable; hence the owner of a coal-carrying schooner, directed to discharge at such dock, cannot recover from the consignee demurrage on the double rate of discharge provided for in the bill of lading in case later vessels were given preference, because vessels carrying coal for the railroad company were given a preference.

In Admiralty. Libel by Cornelius A. Davis and others against the Garfield & Proctor Coal Company. Decree for libelants as indicated.

Benjamin Thompson, of Portland, Me. (Edward S. Dodge, of Boston, Mass., on the brief), for libelants.

Berry & Bucknam, of Boston, Mass., for respondent.

MORTON, District Judge. The schooner Governor Ames was chartered to the Smokeless Fuel Company under a charter party which contained the following provision:

"Discharging per National Association bill of lading, and that for each and every day's detention by default of said party of the second part, or agent, demurrage per N. A. B. lading dollars per day, day by day, shall be paid by said party of the second part or agent to said party of the first part or agent."

A cargo of coal was shipped in her, consigned to the order of the respondent under a bill of lading containing the following provision as to demurrage:

"And twenty-four hours after the arrival at the above-named port and notice thereof to the consignees named, there shall be allowed for receiving said cargo at the rate of one day, Sundays and legal holidays excepted, for every one hundred and fifty tons thereof, after which the cargo consignee or assignee shall pay demurrage at the rate of six cents per ton a day, Sundays and legal holidays not excepted, upon the full amount of cargo as per this bill of lading, for each and every day's detention, and pro rata for parts and portions of a day beyond the day above specified until the cargo is fully discharged, which freight and demurrage shall constitute a lien upon said cargo. After arrival and notice to the consignee as aforesaid, and the expiration of said twenty-four hours, said vessel shall have precedence in discharging over all vessels arriving or giving notice after her arrival, and for any violation of this provision she shall be compensated in demurrage as

if while delayed by such violation her discharge had proceeded at the rate of three hundred tons per day. This bill of lading is subject to terms and conditions of charter party."

The Governor Ames arrived in Boston on March 9, 1903, and by order of the consignee reported to the Boston & Maine Railroad docks at Mystic Wharf at 9:30 a. m. on that day. She was docked there on March 30 and completed her discharge on April 3, 1903. The present libel is for demurrage and was brought on April 3, 1909.

It is claimed by the libelants that vessels arriving after the Ames were given precedence over her at Mystic Wharf, and that from the date of such preference the time allowed the consignee for discharging should be reckoned on a basis of 300 tons per day in accordance with the second provision of National Association bill of lading above quoted, instead of on a basis of 150 tons per day as allowed under the first provision.

[1] The consignees accepting the cargo under the bill of lading were bound by its terms. I have no doubt that certain steamers arriving later than the Governor Ames were docked and discharged before her at Mystic Wharf. The real question is whether such precedence doubled the rate of discharge.

[2-6] Mystic Wharf is owned by the Boston & Maine Railroad. Four schooners of the size of the Ames, or five steamers, could discharge there at the same time. It was equipped with six discharging towers. These were owned by one Rogan, who, under an arrangement with the Boston & Maine, did all the discharging. The wharf was used by everybody who had coal destined for distribution along the line of the Boston & Maine Railroad. Most or all of this cargo was so destined. Any shipper of such coal could send his vessel to Mystic Wharf; but vessels were not allowed to dock there until directed by the Boston & Maine's agent. The control of the wharf was entirely in its hands; the respondent had nothing to do with it. The Boston & Maine habitually gave precedence to vessels bringing coal for its own supply or use, discharging them as soon as possible after their arrival, and before discharging vessels consigned to other persons which had previously reported.

It was suggested by the libelants that a part of the wharf lying above the bridge might have been used for discharging the Ames, and that she was not placed there. The reason for not doing so does not appear. The libelants' claim is not for unreasonable delay in discharging, but for giving precedence to later vesels; and, as will appear, the point becomes immaterial.

There have been several cases in this circuit on the question presented, the most important of which are Evans v. Blair, 114 Fed. 616, 52 C. C. A. 396, Cargo of 3,408 Tons Pocahontas Coal v. Ross, 175 Fed. 548, 99 C. C. A. 170, and Donnell v. Amoskeag Mfg. Co., 118 Fed. 10, 55 C. C. A. 178. Without undertaking to state or analyze each of these decisions, they establish, in my opinion, the following as the law:

Under bills of lading like the one here in question, delay in discharging is provided against by establishing a daily rate of discharge

by the consignee, with demurrage if the unloading is not completed within the time so limited. The consignee may direct discharge at a single wharf, or in a specified berth at a large wharf; and the doubled rate does not apply if the vessel be given her turn where directed. If a vessel be ordered in general terms to large docks having several berths, and at which coal for different purposes is unloaded at separate places, she takes her place in line for the berth at which coal of the sort which she is carrying is habitually discharged.

In order to protect a vessel against discrimination, the provision is inserted halving the time for discharge in case later vessels are given precedence. But this provision, which is "in the nature of a penalty" (Putnam, J., Cargo of 3,408 Tons of Pocahontas Coal v. Ross, supra), is enforced with reference to "reasonable business conditions" (Id.), and usages prevailing at the wharf in question. "Its purpose is the preventing of unjust discrimination." Id. It comes into effect when a preference is given "out of the ordinary course of business at either of the discharging places in question here." Id. In Evans v. Blair, supra, it was explicitly held that the owner of several different wharves might appropriate them to different uses, and that a vessel was only entitled to her rightful place at the dock where such cargo as she was carrying was generally discharged. The fact that later vessels are given priority throws upon the respondent the burden of justifying such action; and it is not sufficient for it merely to show that no departure was made from the ordinary business practice of the consignee or its representative, without also showing that the practice was reasonable.

Applying these principles of law to the facts in this case, it cannot, I think, be doubted that, under the conditions prevailing at the time in question, the Boston & Maine acted not unreasonably in reserving two of the towers on its wharf for its own purposes.

While the evidence is meager, it has not been argued, and I see no reason to believe, that the established practice or "the ordinary course of business" at Mystic Wharf was departed from in the case of the Governor Ames, nor that the vessels which were given precedence over her were of any different class from those which had customarily been accorded precedence at the wharf. It follows that she is not entitled to demurrage computed upon the doubled rate of discharge, but only to demurrage computed at the basic rate; i. e., 150 tons per day.

Decree accordingly.