## The Dictator.[1]

### Street and others, Agents, etc., v. Ashley Phosphate Co.

*(District Court, D. South Carolina. April 2, 1887.)*

1. DEMURRAGE—MODE OF DISCHARGE.
    A consignee cannot force upon a vessel a substituted mode of discharge, involving delay or increased cost.
2. SAME—CONSENT TO CHANGE.
    If the evidence fails to disclose any consideration for the change, and if the substituted mode of discharge was wholly for the benefit of the consignee, and a detriment to the vessel, an agreement on the part of the latter to the substituted mode of discharge is not to be presumed merely from the circumstance that it was not objected to at the time.
3. SAME—FAILURE TO OBJECT—WAIVER OF RIGHTS.
    If a vessel be detained in the stream until her lay-days have begun, and if the consignee then begins her discharge by lighters, the vessel has a right to presume that the delay incident to this mode of discharge will be borne by the consignee, and a failure to object thereto is not to be taken as a waiver of any rights secured by contract.
4. SAME—SELECTION OF WHARF.
    When, by contract, the right to select a wharf is vested in the consignee, "provided that the depth of water be guarantied," the wharf selected must be one to which the vessel can go without having recourse to lighterage.
5. SAME.
    If by contract the wharf is to be selected "immediately on arrival," the consignee is liable for any delay occurring by reason of his failure to select a suitable wharf with promptness.

In Admiralty. Demurrage. Libel *in personam.*
*Bryan & Bryan,* for libelants.

[1] Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

*Hayne & Ficken,* for respondents.

SIMONTON, J. The Norwegian bark Dictator came into this port with a cargo of kainit owned by respondents, in all 698 tons. She was under charter-party, and the kainit was carried under bill of lading to order, on the margin of which was a reference in writing to the charter-party. She dropped anchor on ninth February, and notified the respondents. On 10th she received directions from the respondents to discharge cargo at their wharf some 20 miles up Ashley river. She was drawing 16½ feet. No vessel drawing more than 13½ feet could go to the wharf designated. The respondents sent lighters to her, and received cargo until the draught of the bark was reduced to 13 feet. She was then towed to the wharf named. She began discharging on tenth and finished on twenty-eighth February. By the custom of this port she had 10 days to discharge this cargo of 698 tons. Libelants claim demurrage for five days and a half. Respondents deny the claim.

The question depends upon the dealing between these parties. We find the first transactions between them in the charter-party and bill of lading. If we dissect the charter-party, this construction will appear: Ten working days are allowed for loading the ship at Hamburg, (not counting as lay-days such days on which lighters are prevented by ice from coming to the ship,) and for the discharge of the ship as many days as are customary at the port of discharge. That this is the true construction is shown by the words next succeeding this provision, "If detained longer, demurrage shall be," etc. This is the only reference to the custom of the port of discharge expressly made in the charter-party. The cargo is to be taken from along-side at charterer's risk and expense; so the cargo must be brought to along-side at the ship's expense; this discharge to be effected at one wharf, as ordered by consignee, immediately on arrival of ship. The consignee, in so ordering a wharf, has the privilege of selecting one on Ashley or on Cooper river, if he guaranties a sufficient depth of water. That is, the ship must discharge herself at her own expense, such discharge to be at a wharf which could not be changed, "one wharf" to be selected by the consignee immediately on arrival; and, provided that the depth of water be guarantied, this wharf could be either on Ashley or Cooper river. Here we have an express contract, with no ambiguous words, using no technical terms, whose construction depends on local usage or custom, not referring to any custom of the port. Compare *Robinson* v. *U. S.*, 13 Wall. 363; *Partridge* v. *Phœnix Mut. Life Ins. Co.,* 15 Wall. 579.

The ship was entitled to its performance, emphasized as it is by the marginal addition to the bill of lading. No evidence of a custom of this port to discharge by lighters is admissible. The evidence offered does not sustain the position. If a wharf had been supplied immediately on arrival, the ship could have obtained the appliances either of a horse or of steam, which would have discharged her easily within the time prescribed by the custom of the port. No wharf having been supplied her, her lay-days beginning, she was discharged in part in the stream by

lighters, and compelled to use her own unaided appliances, or to procure others at greatly increased expense and risk. These she was not bound to incur. Thus the ship was delayed by act of the consignees. If consignees had failed to receive cargo, or had delayed receipt of cargo, the result of such delay would have fallen on them. There is no reason for saying they are not equally responsible for delay occasioned by not providing a wharf, as they had contracted to do immediately upon arrival.

But when the consignees determined to discharge by lighters, and not to send the bark at once to a wharf, neither the master nor the agents of the bark made any objections. Does this vary the rights of the parties? A contract may be varied by a new contract, or the strict performance of it may be waived. In the present case the evidence discloses no new consideration for the change in the manner of discharging. The gain was wholly with the consignees. They were, under contract, to furnish a wharf, with sufficient depth of water. It did not suit their convenience to do this. They selected the slower and more expensive process of lightering. If, therefore, the contract of the charter-party and bill of lading ceased to operate in terms, this must be the result of a waiver on the part of the bark, or her agents. Was there such a waiver?

The bark arrived in port in due season. She reported herself, and had the right to discharge at a proper wharf. The consignees alone could select such a wharf. If they neglected or omitted so to do, she could refuse to discharge, and could charge demurrage. *Hawgood* v. *One Thousand Three Hundred and Ten Tons*, 21 Fed. Rep. 681. But this involved delay and litigation. Ships are not built to ride at anchor. They are instruments of commerce. They fulfill their purpose in going from port to port. Litigation should always be avoided, if possible. The master owed it to his employers to discharge cargo, and free them and himself from the extraordinary responsibility of a carrier. The consignees wanted their property. The stipulation for a wharf, immediately on arrival, was not insisted on. It would not be just, however, to put upon the ship the burden and expense of this change; nor can we suppose that, under the circumstances, the master assumed them. He was bound to discharge his cargo in 10 days, unless prevented from doing so by the act of the consignees. He may well have supposed that, if the convenience of the consignees required the discharge of cargo by lighters and if this caused delay, they would pay for it. They had guarantied a certain depth of water. To assist their guaranty they kept the ship in the stream, and there took out cargo. Was it unreasonable to conclude that they would bear the result.

A party is presumed to waive a right when his acts are wholly inconsistent with the assertion and exercise of the right. See *Phillips & Colby C. Co.* v. *Seymour*, 91 U. S. 651. The master is not responsible for the delay occasioned by the act of the consignees. Having been eight days in the stream, and during that time having discharged some 398 tons, the bark, on twenty-first February, went up the Ashley, to the wharf designated. There the master engaged as his stevedore the super-

intendent of the Ashley Phosphate Company, (the respondent,) and proceeded to discharge the remaining 300 tons. Eight of the ten lay-days had been consumed. The master was bound for two more days, and, by the custom of the port, he should discharge at least 70 tons per day. She got up the river on 21st, in a rain. The 22d is a public holiday by statute in South Carolina. This is not a lay-day. The case quoted by libelant (*The Tangier*, 23 How. 44) decides that Thanksgiving day was a lay-day. But that was a day of voluntary observance, not a holiday by statute. Besides this, the master and the consignees both agreed not to work on the twenty-second of February. On 23d and 24th the ship discharged 138 tons. On 25th, 26th, 28th, the rest of the cargo was discharged. The 27th was Sunday. For these three days the respondents must pay demurrage.

Let decree be entered accordingly.