PERCY et al. v. UNION SULPHUR CO.

(District Court, D. Maine. October 27, 1909.)

No. 71.

1. SHIPPING (§ 181*)—DEMURRAGE—ARRIVAL OF VESSEL—CONSTRUCTION OF CHARTER PARTY.

A schooner was under charter providing that her lay days for loading should commence "from the time the vessel is ready to receive * * * cargo and notice thereof is given. * * * Vessel to take turn in loading * * * if required." She arrived in the loading port and gave notice of her readiness to receive cargo. The only berth fitted to load her cargo was owned and controlled by the charterer, and she was required to await her turn, which involved a delay of several days. *Held,* that her lay days commenced from the time she arrived and gave notice.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 592; Dec. Dig. § 181.*

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

2. SHIPPING (§ 171*) — DEMURRAGE — PRACTICAL CONSTRUCTION OF CHARTER PARTY BY PARTIES.

Where, after a vessel was loaded, upon a question of demurrage arising, the charterer's agent, under authority from his principal to indorse upon the bills of lading "when lay days commence and when vessel loaded," indorsed such dates, which were accepted by the master, such action amounted to a practical construction of the charter party by the parties, which was entitled to great, if not controlling, influence.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 568; Dec. Dig. § 171.*]

In Admiralty. Action by Samuel R. Percy and others, as owners of the schooner Cora F. Cressy, against the Union Sulphur Company for demurrage. Decree for libelants.

Edward C. Plummer, for libelants.

Wallace, Butler & Brown, Harrington, Perkins & Englar, and Bird & Bradley, for respondent.

HALE, District Judge. This is a libel in personam, brought by the owners of the five-masted schooner Cora F. Cressy, to recover for her detention at Sabine Pass, Tex., while under charter to the respondent.

The charter party is dated January 11, 1907. By it the charterers agreed to furnish the schooner at Sabine a full cargo of sulphur in bulk, which she was to carry to Baltimore, Philadelphia, or Portland, as ordered, on the signing of the bills of lading.

The provisions of the charter party, material in this cause, are the following:

"It is agreed that the lay days for loading and discharging shall be as follows (if not sooner dispatched), commencing from the time the vessel is ready to receive or discharge cargo, and notice thereof is given to the parties of the second part: Shippers to furnish cargo at the rate of 300 tons per day, Sundays and holidays excepted, and discharge 300 tons per day, Sundays and holidays excepted. Vessel to take turn in loading and discharging, if required. Vessel to be free of wharfage at both loading and discharging port. Vessel not to report for cargo before February 20, 1907, unless with consent of the charterers. And that for each and every day's detention by default of said parties of the second part, or agent, one hundred and seventy-five dollars per day, day by day, shall be paid by said parties of the second part, or agent, to the said parties of the first part, or agent."

The Cressy arrived at Sabine Pass Saturday afternoon, March 16, 1907, and came to anchor at the usual anchorage where vessels lie which are to load at the respondent's dock.

The master of the Cressy gave notice to C. H. Dickinson, the charterer's agent at Sabine, at 9 o'clock in the morning of Monday, March 18, 1907, that his vessel was ready to receive cargo; and Mr. Dickinson made the following indorsement on the master's copy of the charter party:

"Sabine, Texas. 3/18/07.

"Schr. Cora Cressy ready for cargo 9 a. m. Monday, March 18, 1907.

"Union Sulphur Company,

"C. H. Dickinson, Agent."

There was but one loading berth at Sabine for vessels like the Cressy, and that berth was controlled by the respondent, who had installed machinery for the loading of sulphur cargoes. It was expected that, with the use of such machinery, a very large quantity could be loaded in a day.

At the time of the Cressy's arrival at Sabine, several vessels had arrived ahead of her, which were under charter to the respondent for sulphur cargoes. One of these vessels was then loading at the respondent's dock, and the others were at their anchorage waiting for an opportunity to go to the dock. While the Cressy remained at her anchorage waiting for a berth, she was at all times in readiness to receive cargo. The Cressy was berthed at the respondent's dock at 1 o'clock in the afternoon of April 8th, and loaded in turn with the earlier arriving vessels. After she reached her berth, her loading proceeded at the rate of more than 300 tons per day, and was completed at noontime on April 11, 1907, when she had on board about 3,000 tons. On the day after the completion of her loading the charterer's agent made the following indorsement upon the master's copy of the charter party:

"Sabine, Texas, April 12, 1907.

"Schooner Cora F. Cressy finished at noon, April 11, 1907.

"Union Sulphur Company,

"C. H. Dickinson, Agent."

Immediately after the completion of the Cressy's loading, some question arose between the master and Mr. Dickinson, the respondent's agent, in reference to indorsing on the bills of lading the amount of the demurrage which they had then agreed to be due the vessel; and thereupon Mr. Dickinson wired his principal (the Union Sulphur Company), at New York, for instructions, and on April 12th he received the following reply:

"Schooner Cressy. Endorse on bills of lading when lay days commence and when vessel loaded. Demurrage, if any, settled at destination."

Upon the receipt of this telegram, Mr. Dickinson made the following indorsement upon the bills of lading:

"Sabine, Texas, April 12, 1907.
"The schooner Cora F. Cressy was ready for cargo at 9:00 a. m. on March 18, 1907. Finished loading at noon, April 11, 1907. Assuming that her cargo consists of 3,000 tons, her lay days expired on April 11, 1907, at 9:00 a. m., as per charter party, dated January 11, 1907; hence demurrage is due this vessel for 13 days and 3 hours.          Union Sulphur Company,
                                             "C. H. Dickinson, Agent."

Thereupon the master signed the bills of lading, proceeded on his voyage, and made due delivery of the cargo.

The libelants contend that, under the terms of the charter party, the charterers were required to furnish cargo at the rate of 300 tons per day, counting from the time of the vessel's report and readiness for cargo. The respondent contends that it was required to furnish cargo at that rate only from the time the vessel reached her loading berth.

1. From what time were the libelants entitled to have their lay days count?

The answer to this question must rest upon the proper construction to be given to the charter party under which the vessel was to receive her cargo. In Harding v. Cargo of Coal (C. C.) 147 Fed. 971, this court has passed upon questions quite similar to those under consideration in the case now before it.

In that case the court had occasion to say that the contention there made as to the construction of charter parties—

"should not be followed where a reasonable construction may be given, which gives force to every term and provision of the contract, and is, at the same time, consistent with law and with the intention of the parties."

There the charter party provided that the lay days should commence from the time the captain reported himself ready to receive or discharge cargo, and excepting Sundays and national legal holidays, unless used; that the vessel was to have her turn in loading, and should be loaded promptly.

In that case, as in the case now before me, it appeared that the dock at which the vessel was to be loaded was wholly under the control of the charterer; and all vessels that arrived were obliged to come to an anchorage in the harbor, from which point they reported to the charterer's agent, and then waited until such time as the charterer had a berth at which the vessel could be docked and loaded, when the char-

terce would send a steam tug and berth the vessel at such dock as it desired to load her.

In that case the agent of the railroad company, at whose dock the vessel was to load, admitted that under the provisions of the charter party the vessel was an "arrived vessel," and entitled to count her time from the time she came to her anchorage and gave notice to the charterer's agent of her readiness to load.

In the case at bar, when the vessel came to her anchorage at Sabine and notified the charterer of her readiness for cargo, there was nothing further that she could do, except to wait the convenience of the charterer in finding a berth and arranging for her loading.

The present case differs from the Harding Case in but one essential particular, and that relates to the party by whom, and the manner in which, the vessel was to be docked. The evidence upon this point was within the power of the charterer. But neither party has offered any proofs on this point. In the absence of testimony, the case cannot be distinguished from the principles which the court announced in the Harding Case.

In Merriam v. United States, 107 U. S. 437, 441, 2 Sup. Ct. 536, 540, 27 L. Ed. 531, the Supreme Court said:

"It is a fundamental rule that in the construction of contracts the courts may look, not only to the language employed, but to the subject-matter and the surrounding circumstances, and may avail themselves of the same light which the parties possessed when the contract was made." Nash v. Towne, 5 Wall. 689, 18 L. Ed. 527; Barreda v. Silsbee, 21 How. 146, 161, 16 L. Ed. 86; Brawley v. United States, 96 U. S. 168, 24 L. Ed. 622.

In the light of these decisions of the Supreme Court, it is the duty of this court to look, not only at the language employed by the parties in making their contract, but at the subject-matter of the surrounding circumstances, and to avail itself of the same light which the parties enjoyed when the contract was executed. If we examine this charter party in view of all the circumstances, the language of Judge Dallas in Carbon Slate Co. v. Ennis, 114 Fed. 260, 261, 262, 52 C. C. A. 146, 147, 148, although in another connection, is applicable:

"The ship's readiness to receive the cargo 'from the charterers' shippers' was not dependent upon their readiness to assign her a berth. So long as this was not done, she was detained in waiting, not by any lack of readiness on her part, but by the unreadiness of the shippers, and therefore they, and not the master, were responsible for the consequent delay in loading her. * * *

"If, as is contended, the delay in question was caused by a custom of the port that each vessel should await its turn to obtain a wharf, that fact could not relieve the charterers from their positive engagement as to the time at which the lay days would commence to count."

Under the terms of the charter party the libelants were clearly entitled to have their vessel's lay days count from 9 a. m., March 18, 1907, at which time both parties conceded that the vessel was ready for cargo. Any other conclusion would be not merely unreasonable, but contrary to the understanding of both parties, and inconsistent with the language of the charter party, when examined in the light of the surrounding circumstances.

2. It is necessary for the court also to pass upon the question: What effect should be given to the indorsements made by the charterer's agent upon the charter party and bills of lading?

After the vessel had finished loading, the question arose as to whether the demurrage, which the master of the schooner claimed, and which the charterer's agent conceded to be due the vessel, should be indorsed upon the bills of lading.

It is true that the charter party provided that the bills of lading were to be signed "without prejudice to this charter," and when the question of the indorsement arose the libelants did not insist upon this provision of the charter party; but, with a full knowledge of all the existing conditions, they directed their agent to indorse upon the bills of lading "when lay days commence and when vessel loaded." They must, therefore, be held to have waived their rights in that particular.

In The Dictator (D. C.) 30 Fed. 637, 639, Judge Simonton said:

"A party is presumed to waive a right when his acts are wholly inconsistent with the assertion and exercise of the right."

Mr. Dickinson communicated with his principal in New York, and upon the receipt of the telegram, the contents of which I have already referred to, he made the indorsement upon the bills of lading, and thereupon the master of the Cressy signed them, and proceeded on his voyage.

We, therefore, have what may be said to be a "practical construction" of the contract while the parties were in the midst of its performance, which the courts have frequently said "is one of the best indications of their true intent." Fitzgerald v. First National Bank, 114 Fed. 474, 478, 52 C. C. A. 276, 280.

The fact that the indorsement as made contains an error does not prevent its being accepted, so far as it conforms to the facts and was authorized by the charterer.

The respondents, by their agent at Sabine, not merely adopted this practical construction of the contract at the time of the vessel's arrival, but later, when the question of the indorsement arose, the charterer's agent then agreed with the master of the Cressy upon the very question now in dispute.

A most salutary rule in this connection is stated in Marriner et al. v. Luting, Fed. Cas. No. 9,104:

"An agreement as to the proper interpretation of a contract bars each party from thereafter claiming a construction inconsistent therewith."

The respondent, through its duly authorized agent, adopted a practical interpretation of the contract, which is entitled to great, if not controlling, influence. Topliff v. Topliff, 122 U. S. 121, 7 Sup. Ct. 1057, 30 L. Ed. 1110.

The whole testimony relating to the indorsements made upon the charter party and bills of lading confirms me in the result which I have reached.

The entire evidence, confirmed as it is by the acts of the parties and the decisions of the court, are in accord upon this branch of the case, and lead to the conclusion already announced.

3. I will not take as final, however, the respondent's indorsement that demurrage is due for 13 days and 3 hours; but, unless the parties stipulate as to the amount of the demurrage, the matter may be referred to an assessor to compute the same upon the findings of the court, taking into account the actual quantity of cargo which the vessel had on board.

An interlocutory decree may be entered for the libelants.