82 U.S. 573
 21 L.Ed. 229
 15 Wall. 573
 PARTRIDGE
v.
THE INSURANCE COMPANY.
 December Term, 1872
 
 ERROR to the Circuit Court for the District of Missouri; the case apparently having been thus:
 In January, 1867, one Winslow being agent for the State of Missouri of the Phoenix Mutual Life Insurance Company of Hartford, Connecticut, in the business of soliciting persons to insure and keep insured in that company, Partridge made an arrangement with him to go into partnership with him in the agency; and Winslow having written to the company accordingly, the company in reply tell him that there was a Mr. Jones—'now the company's agent for Minnesota, and a man second to none in the West for energy and sound judgment'—who was very sanguine that he could make arrangements with him, Winslow, for a systematic and thorough 'working' of the two States, which would prove mutually beneficial. And that 'without meaning to be understood as saying one word against Mr. Partridge—on the contrary, not seeing why matters cannot be arranged so as to have him also as one of the workers for the company—the company would advise Winslow to hold on and wait a little before making any permanent arrangement.'
 Jones coming to St. Louis soon after this, he, Winslow, and Partridge entered into an arrangement by which Winslow retired, leaving Jones and Partridge partners in the State agency. Jones in a short time went to Hartford, and was sent by the company on business in Iowa, &c., leaving Partridge alone in Missouri. Partridge went on as he had been going on from his first arrangement with Winslow, in soliciting people who had not previously been insured to insure themselves in the company and in getting renewals of such policies as had been made previous to his coming in and had now run out.
 On all first insurances he received 20 per cent. of the premium, and on all renewals 7 1/2 per cent. About his right to these, or to his having actually received them, there was no dispute.
 In September, 1867, the company having written to Partridge about persons who had applied for an agency in Missouri, he writes to the company, responding civilly to some inquiries, but says——
 'I am free to confess a little surprise at your remarks, coupling the persons you speak of with the general agency of the State of Missouri. I supposed it was settled that Mr. Jones and myself were to occupy the position of State agents. And just here permit me to inquire what my status is, if the State agency is open to the trial of candidates.'
 To this the company, by a letter dated September 7th, 1867, reply:
 'Concerning your status in Missouri, it is simply this: You are there working up a business for yourself, and are paid the highest commissions which we pay, and in any arrangements which we may make for the State, will not overlook your interests, but we had no idea of giving you the exclusive control of a State which it will require a most experienced agent to take charge of and work up.'
 'After I received this letter of the 7th of September,' said Partridge, in speaking of it, 'I understood it, and was satisfied with it, and continued on as agent, soliciting policies, collecting premiums and renewals, and reporting as required by the rules of the company.'
 In December, 1867, the company sent out a Mr. Dye to St. Louis, telling Partridge that it is with a view to his procuring the company a greater amount of business out of the State; that Dye's efforts would not conflict with his, and that he, Partridge, 'can proceed in his own way on his own account.'
 Difficulties, however, soon occurred in consequence of Dye's coming out, and on the 15th of February, 1868, a little more than a year after his agency began, Partridge was discharged by the company, he having at this time a sum of $1772 in his hands collected for premiums. He now brought suit in one of the State courts of Missouri against the company. The company removed the case into the Federal court, under the act of Congress of 1866, and that of 1867 amendatory thereof. These enact that after a suit removed from a State court has been entered in the Federal court, it shall proceed in the same manner as if it had been brought there by original process, and the pleadings have 'the same force and effect, in every respect, and for every purpose, as the original pleadings would have had by the laws and practice of such State if the cause had remained in the State court.'
 On the trial the plaintiff admitted that he had received 20 per cent. commissions on all first premiums, and 7 1/2 per cent. commissions on all renewal premiums that had been actually collected by him, and that there was in his hands at the time of his discharge $1772 in money, the property of the company, if they were not liable to him for the value of future commissions to accrue on the policies.
 It was then announced by him that the real point of dispute in the cause was this, viz.: that, under the facts and circumstances of his employment and service, the letters and correspondence had with him by the company, and particularly by the terms of the aforesaid letter of September 7th, 1867, and by force and virtue of a general usage existing in St. Louis at that time in regard to the business of life insurance companies and their agents, he was entitled to retain the agency, and, in case of his removal against his will, and without sufficient cause, was entitled to be paid a commutation equal to the present value of his commissions, computed by the actuarial rule for computing the present value of policies.
 The defendants maintained that they were not bound by any usage except that of their own company; that the plaintiff was their agent only at the will of the company, and might be discharged at any time without cause, and was not entitled to any payment or commutation on policies solicited during his agency, except his commission actually accruing during his agency, which, as he admitted, he had received.
 They pleaded further their set-off; to their pleading which no objection was made by the plaintiff.
 The plaintiff then propounded to a witness the following question, the witness having first qualified himself as an expert in insurance matters, terms, and language:
 'Is there in the phrase contained in the letter of defendant of September 7th, 1867, to wit——
 "Concerning your status in Missouri, it is simply this: You are there working up a business for yourself, and are paid the highest commissions which we pay'——
 'any peculiar or technical meaning as used by men engaged in life insurance, and as applied to the business of life insurance different from the ordinary meaning of these terms?'
 In answer to which question the plaintiff offered to prove by this witness, and by many others experienced in life insurance, that the said phrase did have a peculiar meaning in that regard, well understood by men in the business of life insurance, and not well understood by those not familiar with the business; that its meaning as understood in that business was that the agent should have the right to solicit and cause policies to be issued according to the published rules and rates of the company, and should have the right during the life and force of such policies to collect all renewal premiums thereon, and have commissions on such renewals, and that if he was discharged by the company without sufficient cause he was entitled to be paid immediately, the present value of his commissions, to be computed by the actuarial rule used by such companies to value policies.
 The question offered to be put was objected to by the defendant, and the objection was sustained by the court, on the ground that the language referred to was plain and intelligible, and required no explanation, and that such evidence as was offered would vary the contract between the parties. To this ruling the plaintiff excepted.
 The jury found a verdict for the company, $1772 on the counter claim, and judgment was entered accordingly. The plaintiff now brought the case here.
 
 Messrs. T. W. B. Crew and J. F. Hardin, for the plaintiff in error:
 
 1. The question was what an agent's 'working up' the business of life insurance means? Now, on their face, have those words in connection with that business, a full, plain, unquestionable meaning, known to all who hear them? We offered to prove by persons in the business that they had not such a meaning, but contrariwise had a technical and peculiar meaning, understood only by persons in the business, and we offered moreover to show exactly what that meaning was. Yet, thus to show the true meaning of the contract, the court held would vary its true meaning, and that though we offered to prove it on its face ambiguous, it was on that same face without the possibility of two meanings.
 2. The court erred in entering judgment for the $1772. Even if by the laws of the State and practice of its courts such a thing had been allowable (which we do not concede), when the company elected to remove the cause to the Federal court it abandoned all rights under the State laws and practice, and was bound to conform to the rules of practice in the Federal courts. These are common-law rules, and set-off does not prevail.
 Mr. N. P. Chipman, contra.
 Mr. Justice MILLER delivered the opinion of the court.
 
 
 1
 The question did not arise whether the custom which the plaintiff offered to prove could have been proved as the measure of his compensation, in the absence of any express contract, because the plaintiff had introduced in evidence a letter from the defendant in reference to this compensation, under which he said he had acted in taking the policies for which he now claimed the additional commission. There was no question as to the amount, or percentage, or premium, which was to be paid under this letter. The plaintiff stated that he had retained a certain percentage, which was that allowed by the company. The testimony was not offered to show what was the highest commission paid by the company.
 
 
 2
 It appears to us, as it did to the Circuit Court, that the testimony offered would have established a new and distinct term to the contract. It would have established a contract very different from the written one introduced by plaintiff. The language of the letter was neither ambiguous nor technical. It required and needed no expert, no usage to discover its meaning. To have admitted the usage offered in evidence in this case would have been to make a contract for the parties differing materially from the written one under which they had both acted for some time.
 
 
 3
 The tendency to establish local and limited usages and customs in the contracts of parties, who had no reference to them when the transactions took place, has gone quite as far as sound policy can justify. It places in the hands of corporations, such as banks, insurance companies, and others, by compelling individuals to comply with rules established for the interests alone of the former, a power of establishing those rules as usage or custom with the force of law. When this is confined to establishing an implied contract, and the knowledge of the usage is brought home to the other party, the evil is not so great. But when it is sought to extend the doctrine beyond this, and incorporate the custom into an express contract whose terms are reduced to writing and are expressed in language neither technical nor ambiguous, and therefore needing no such aid in its construction, it amounts to establishing the principle that a custom may add to or vary or contradict the well-expressed intention of the parties made in writing. No such extension of the doctrine is consistent either with authority or with the principles which govern the law of contracts.
 
 
 4
 A question is raised in this court not raised in the Circuit Court as to the right of the defendant to recover, by way of set-off or cross-action against the plaintiff, a sum of money in his hands as agent of the plaintiff, which was admitted to be due, if plaintiff's claim was not established. The amount was admitted by plaintiff, and no objection was made to pleading it as a set-off. Therefore, none can be made here. But if the point were open to inquiry, it is settled by the case of West v. Aurora City,* that defendants in the Circuit Courts of the United States can avail themselves of the laws which prevail in the State concerning the right of set-off generally. It would be a most pernicious doctrine to allow a citizen of a distant State to institute in these courts a suit against a citizen of the State where the court is held and escape the liability which the laws of the State have attached to all plaintiffs of allowing just and legal set-offs and counter claims to be interposed and tried in the same suit and in the same form.
 
 
 5
 JUDGMENT AFFIRMED.
 
 
 
 *
 6 Wallace, 139.