DOTSON v. KIRK et al.

(Circuit Court of Appeals, Fourth Circuit. July 12, 1910.)

No. 899.

1. ACTION (§ 23*)—EQUITABLE DEFENSE IN ACTION AT LAW.
Code Va. 1904, § 3299, provides that in an action on a contract defendant may file a plea alleging any such failure in the consideration, fraud in procurement, or any other matter as would entitle him to recover damages at law from plaintiff or to relief in equity in whole

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

or in part against the contract. *Held* that, in an action at law for breach of a timber contract, upon an equitable .plea under the statute the court could not rescind the contract for fraud; only a court of equity having such power.

[Ed. Note.—For other cases, see Action, Cent. Dig. § 151; Dec. Dig. § 23.*]

2. CONTRACTS (§ 94*)—FRAUD (§ 11*)—RESCISSION—RIGHT OF ACTION—"MISREPRESENTATION."

A "misrepresentation," the falsity of which will afford ground for action for damages or a bill for rescission of a contract, must be as to an existing fact and an affirmative statement of facts in contradistinction to the mere expression of an opinion which is ordinarily not presumed to deceive or misrepresent.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 427; Dec. Dig. § 94;* Fraud, Cent. Dig. § 12; Dec. Dig. § 11.*

For other definitions, see Words and Phrases, vol. 5, pp. 4537, 4538.]

3. CONTRACTS (§ 99*)—RESCISSION—RIGHT OF ACTION—"FALSE REPRESENTATION."

In a suit to cancel a contract for false representations, the burden is upon complainants to prove that the representations were made as alleged; that they were false and fraudulent; that defendant knew they were untrue; that they were material inducements to make the contract; and that complainants were deceived by them.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 448; Dec. Dig. § 99.*

For other definitions, see Words and Phrases, vol. 3, pp. 2668–2670; vol. 8, p. 7661.]

4. CONTRACTS (§ 99*)—RESCISSION—FRAUD—EVIDENCE.

Evidence *held* not to show that fraud was practiced on the purchaser of standing timber in the negotiations which led up to the execution of the contract.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 99.*]

5. COURTS (§ 371*)—FEDERAL COURTS—RIGHTS UNDER STATE STATUTES—SET-OFF AND COUNTERCLAIM.

Under Code Va. 1904, § 3304, providing that if plaintiff be the person with whom the contract sued on was originally made, or the personal representative of such person, the jury shall ascertain the amount to which defendant is entitled and apply it as a set-off against plaintiff's demand, and if the amount be more than plaintiff is entitled to, shall ascertain the excess, fix the time from which interest will be computed, and render judgment for plaintiff for such excess with interest, in an action in a federal court by the vendor against the purchaser of standing timber for breach of the contract, if defendants can show that the vendor has failed to perform the contract, they can do so either by way of defense or of counterclaim; set-offs and counterclaims of a legal character being available to defendant in an action at law in the federal courts, if allowed by state practice, even to the extent of enabling defendant to recover judgment against plaintiff.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 371.*

Conformity of practice in common-law actions to that of state court, see notes to O'Connell v. Reed, 5 C. C. A. 594; Nederland Life Ins. Co. v. Hall, 27 C. C. A. 392.]

Appeal from the Circuit Court of the United States for the Western District of Virginia, at Abingdon.

Bill by Charles M. Kirk and others against N. B. Dotson. Decree for complainants, and defendant appealed. Reversed and remanded, with directions.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

George E. Penn (George C. Peery, O. M. Vicars, and James L. White, on the brief), for appellant.

Roland E. Chase (Daniel Trigg, on the brief), for appellees.

Before GOFF and PRITCHARD, Circuit Judges, and CONNOR, District Judge.

CONNOR, District Judge. Complainants, citizens of the states of Ohio and Pennsylvania, filed their bill in the Circuit Court of the United States for the Western District of Virginia, against defendant, a citizen of the said district, alleging: That on the 18th day of April, 1901, they entered into a contract, in writing, with defendant in the following words and figures, to wit:

"This agreement made and entered into this the 18th day of April, 1901, by and between N. B. Dotson, of Wise, Va., party of the first part, and Charles M. Kirk, of Rosemont, Ohio, James McKelvey, of Somerset, Pennsylvania, John C. Jackson, of Youngstown, O., and John C. Leavitt, of Niles, Ohio, parties of the second part, witnesseth:

"That whereas the said parties of the second part have made personal investigation, of the white oak timber in Dickenson county, Virginia, on the waters of Pound river and its tributaries, and McClure river and its tributaries, and Crane's Nest river and its tributaries, as to the quality of said timber, its location, facilities as to cutting and getting same out to railroad, etc., and are satisfied from the said investigation with the same, and are desirous of purchasing all of the white oak trees twenty inches and upwards in diameter, which will measure forty feet from the ground, to or near the top of the trees, where the large limbs branch out, and in which measurement the small limbs are not to be considered:

"Now, therefore, in consideration of two dollars per tree, paid and to be paid as hereinafter stated, the said first party agrees to procure and to sell to said second parties, and said second parties agree to purchase from said first party, fifty thousand white oak trees, twenty inches and upward in diameter, two feet from the ground, with a body of forty feet measuring from the ground, to the top of the trees where the large limbs branch out as aforesaid, or as many thereof as said first party may be able to procure or cause to be conveyed, by deed or deeds with covenants of general warranty, to said second parties, it being understood, however, by and between the parties to this contract, that said number of fifty thousand trees is only an estimate, of the number of trees that the said first party thinks he will be able to procure and deliver to said second party as aforesaid, and if it should be found that when said trees are received and counted by said second parties, that the number of trees that the said first party has procured or caused to be conveyed, by the parties on whose lands said trees stand, or the owners of said trees, by deed or deeds with covenants of general warranty as aforesaid, is less than fifty thousand trees, then said second parties are to be required to take and pay for the actual number of trees, said first party has procured and caused to be delivered to said second parties as aforesaid, and said second parties shall have no claim against said first party, by reason of his failure to procure and cause to be conveyed to said second parties the whole of the said fifty thousand trees. Said first party agrees to furnish men to show up said trees to said second parties, and said parties of the second part agree to furnish men to measure, receive, brand and cut said trees promptly, and the said second parties agree and bind themselves to pay to said first party two dollars per tree for each of said white oak trees, one-third of which shall be payable within four months of this date, and when said trees are delivered and conveyed to said second parties by the respective parties on whose lands said trees stand, or the owner of the said trees, are to pay to said first party the residue of the purchase price for each of said respective lots in one and two years respectively from the date hereof, with interest thereon at the rate of six per cent. per annum until paid, and the lien shall be re-

tained in each of said deeds, to secure the payment of the said deferred payments, for the timber conveyed by each of said deeds respectively, and the said second parties shall have the right at any time to anticipate the said deferred payments, and pay the same in full, including interest thereon accrued, up to the time of such payment, at any time before maturity, and if such deferred payments shall be paid in full, including interest thereon accrued to the date of said payment, within six months from the date hereof, then the said second parties shall have a discount of two per cent. on the amount of said deferred payments so paid, but if the same shall not be paid within six months aforesaid, according to the terms of this agreement, then the said second parties shall have no discount whatever and the said second parties have this day paid said first party the sum of five thousand dollars on the purchase price of said trees, the receipt of which is hereby acknowledged, and which said sum of five thousand dollars is to be applied as a payment, on the one-third cash payment provided for heretofore. Said second parties are to have ten years from this date and a reasonable time thereafter, if necessary, so as not to exceed two years, in which to cut and remove said trees, off said lands, upon which the same stand respectively, and if said second parties shall fail to cut and remove the same within said ten years, or a reasonable time thereafter, not to exceed two years, then the owners of the land, upon which said trees may be standing, at the expiration of said term, shall have the right to deaden such of them as may be standing upon said land which the owners thereof desire to clear for the purpose of cultivation, and said second parties are to have the right to enter upon each of said respective tracts of land, for the purpose of cutting and removing any of said timber, which may be standing upon said tract of land, and may use, free of charge, at any time within eight years from this date, sufficient timber for necessary tramroads, on such tracts of land, so that no valuable merchantable timber shall be used for said tramroads.

"It is further agreed that, in the event said second parties shall need right of way to remove said trees over any tract of land, in said county of Dickenson, to which said first party now has the legal title, said second parties shall have such right of way free of charge.

"And it is further agreed that when said second parties shall have measured and branded said trees or any of them, they shall be conclusively presumed to be satisfied with the diameter and length of same, and be bound by the measurement thereof, although the same may not in fact be either 20 inches in diameter or 40 feet long, but when branded by said second parties or their agents, the same shall be paid for according to the terms of this contract as aforesaid. This contract is acknowledged and executed in duplicate.

"Witness the following signatures and seals on this the day and date first above written"

That, as an inducement to complainants to enter into said contract, defendant, through his agents, represented that he was the owner and had control of a large boundary of white oak timber land situate in Dickenson county, Va., on the waters of Pound river, and its tributaries, McClure river and its tributaries, and Crane's Nest river and its tributaries. That among other tracts pointed out to them by defendant's agents and represented as the property of defendant, or under his control, and to which he held, or could procure, a good and indefeasible title, were certain valuable tracts of white oak timber, known as the "Mullins" and "Chase" tracts, the "Ramey Flats timber," the "Fulton timber," and other large and valuable tracts. That said agents further represented to complainants that all of said timber was upon tracts of land lying in a body, 8 miles wide and 12 miles long. That defendant would secure to complainants rights of way over said lands, etc. That said tracts were shown to complainants by defendant's agents and represented to be the property, or under the

control of defendant, as the timber which they were to get under said contract. All of which statements and representations were believed and relied upon by complainants. That said statements and representations, except that the timber was growing and standing upon the lands within the territories mentioned and upon the streams mentioned and their tributaries, complainants allege were false, fraudulent, and deceptive. That they relied upon said statements, and believed them to be true, and "being satisfied from their investigation and examination of said timber, as to its quality, its location, and facilities as to cutting and shipping, all of which was based upon said representations and statements so made by said agents of said Dotson, as aforesaid, and all of which statements and representations were afterwards, and prior to, the date of said contract, gone over and discussed with said Dotson, his agents, and attorneys in his presence," so that he was cognizant of all of said statements and representations and he made no statement modifying them and thereby confirmed and approved them. That, pursuant to said contract, and believing that defendant owned or controlled, or that he could procure, said timber for them so as to give them a good and perfect title thereto, and being anxious to receive said timber and have same conveyed to them, they furnished men, as they were under said written contract to do, to measure, receive, brand, and count said trees promptly. That they measured about 11,000 of the 50,000 trees "estimated by said Dotson, as aforesaid, in isolated tracts, scattered here and there, all over the large territory pointed out and represented as the boundary of timber, which they could get from the defendant by virtue of their purchase from him." That these trees were taken up, measured, and received by complainants upon the assurance of defendant, and his agents, that the main tracts and boundaries of valuable timber which they would receive under said contract were fair samples of the entire timber and they were only delayed briefly in permitting them to take up the timber on these tracts and other large and valuable tracts, on account of some irregularity as to title which would be readily cured and straightened out and they would be able to get same, etc. That all of these representations they found to be false. That complainants, relying upon said representations made by defendant and his agents, went to great expense in preparing to take and receive said timber, etc. That defendant instituted an action at law against complainants in the circuit court of Wise county, Va., demanding $50,000 damages for an alleged breach of contract. That complainants, by appropriate proceedings, caused said action to be removed into the Circuit Court of the United States, and the same has been duly docketed in said court.

Complainants pray that the contract of April 18, 1901, be canceled and rescinded; that an account be taken of the amount paid by them on account of said contract, and the expense incurred by complainants by reason of their attempt to perform the same on their part; that defendant be enjoined from prosecuting his action at law against them during the pendency of this suit; and that upon the final hearing said injunction be made perpetual, and for such other and further relief as they may be entitled to in the premises, etc.

Process being duly issued and served, defendant filed exceptions to the bill and demurred to same, which were overruled, whereupon he filed his answer and cross-bill. He admits the execution of the contract and denies that the same was procured by any false or fraudulent representation by him or any one authorized to act for him. He sets forth, at much length, a history of the negotiations which preceded and led up to the execution of the contract, saying, among other things: That from the beginning of his negotiations with complainants up to and including the moment when they were consummated in the execution of the contract aforesaid, he never undertook or agreed to procure and sell to complainants and never represented either himself, or by his agents, that he could procure and sell to them the trees upon any specified tract, or tracts, of land, except as to the two tracts which he, at that time, owned—one of which was situate upon George's fork of Pound river and the other on the divide between McClure's and Russell's fork. On the contrary, he avers that he only represented that he would procure and sell to complainants, and only undertook to procure and sell them white oak trees in the section indicated, to the number of 50,000, if they could be obtained, of the character and description set forth in said contract. This was clearly understood between the parties, and the contract was drawn in conformity with this understanding. As a matter of fact, this respondent had never made a personal examination of the different tracts of land embraced in the territory except in a general way in riding through the territory on horseback over the country roads, but his information generally was that the finest timber in the territory was upon the "Ramey Flats" and the "Fulton and Phipp Tracts" which he procured and turned over to complainants, and the trees upon which they partially received and measured. He denies that he, or his agents, represented that the trees which he was to purchase under said contract were standing and growing upon lands laying in a body and would include a boundary 8 miles wide and 12 miles long, or would be in a "solid body." He further denies that he represented to complainants, or their agents, that he owned and had title to large tracts and boundaries of land in Dickenson county, over which a right of way would be required to remove said timber to market. "He simply agreed that if such right of way was needed through two tracts owned by him, complainants should have the same free of charge and this was so expressed in the contract." He denies that the trees measured by complainants were isolated tracts scattered over large territory and represented as the timber which complainants would get. While complainants were measuring and receiving trees upon tracts already procured, respondent was engaged in securing other contracts, and "if they had not abandoned the contract he would have carried out the same fully according to its true spirit and intendment." He denies that the title to the tracts secured were imperfect—if there were defects in the titles this fact was unknown to respondent and no objection on this ground was made to him by complainants. "If substantial defects existed in titles to any of the tracts, these could have been passed by, as respondent was in a position to furnish all the trees called for by the contract and according to its terms, the title to which

was good. It is not true that many of the owners of the tracts listed had not contracted the timber and agreed to sell the same. On the contrary, respondent had a written contract for each and every tract listed." He says:

"It may be that there-were trees upon the tracts which did not come up to the requirements of the contract. Complainants were not required nor expected to measure and receive them. It is true that they did not have, and it may be true that he could not procure, title to the Mullins and Chase tracts —he avers that he was under no obligation, either by virtue of his contract or of any representation to procure such title for complainants."

He admits that his action at law was instituted before the expira-. tion of the time for the first payment on the timber, but denies that it was instituted while complainants were importuning him to let them have the timber they were to get under their purchase from him; on the contrary, complainants had abandoned the contract and were leaving the state when he instituted his action against them. He denies that he abandoned the contract; on the contrary, he was ready, able, willing, and anxious to comply with the said contract when complainants abandoned the same and left the state. He denies that complainants were ready, willing, and able to take, receive, have measured, and pay for the timber which they were to receive under said contract; on the contrary, he avers they willfully abandoned, without any fault on his part, the contract and its performance. He further says that immediately after the execution of the contract he set about in good faith to carry out the same on his part. To this end he procured not less than 100 timber contracts upon the streams and their tributaries and in the territory mentioned and at considerable expenditure of time and upon which he paid large sums of money. These contracts embraced more than 50,000 trees of the kind and character agreed to be procured and were in hand at the time complainants abandoned the contract.

Defendant alleges: That he had an agreement with responsible parties, who owned and controlled the timber of the required character and in the territory embraced in the contract, that if the contracts already secured did not yield 50,000 trees of the kind and character called for by the contract they would furnish him enough trees of the kind called for to make up the required number and that said parties were able to carry out and would have carried out the said agreement. That he furnished men to show complainants the trees and was ready, willing, and able to convey same to them by deeds with covenants of general warranty in pursuance of said contract and has always been ready, willing, and able to do so. That complainants, in part execution of said contract, made the cash payment of $5,000 and commenced to measure and receive, and did measure and receive, 17,600 of said trees. That they are indebted to him for said number of trees received by them at $2 each. That, without any fault on his part, complainants willfully abandoned their contract, refused to measure and receive any more trees thereunder, and have left the state, and that, by so doing, they have caused him to suffer great loss and damages. He prays that the answer be treated as a cross-bill, and that proper process issue thereon against the complainants and that they be required to answer

same; that they be decreed to pay him $2 each for the 50,000 trees which they contracted to take from him; that they be required to account, etc. Complainants filed a demurrer to the cross-bill, which was sustained.

It seems that, in the action at law by defendant against complainants, service of process was made only upon Chas. M. Kirk, one of the defendants named in the writ; the other defendants being nonresidents. All of them, to wit, said Chas. M. Kirk, and John C. Jackson, J. C. Leavitt, and James McKelvey, joined in the bill filed in this cause, although those who had not been served with process had not entered an appearance in said action. Defendant filed his petition praying that said complainants be required, before proceeding further in this cause, to enter an appearance in said action. The petition was granted and the parties required, within 20 days, to enter their appearance. The complainants having failed to obey said order, defendant herein moved the court for an order attaching them for contempt in that they refused to comply with the order, etc. This was refused upon the grounds set out in the opinion of Judge McDowell. Complainants having filed a replication to the answer, the cause was set down for hearing upon the pleadings and depositions.

On February 11, 1909, a final decree was made: Enjoining defendant from prosecuting his action at law against complainants; canceling the contract executed April 18, 1901; and directing an accounting between the parties. From this decree defendant prayed for an appeal which was duly granted. Defendant assigned a number of errors alleged to have been committed by the court. Several of them are directed to questions of practice and procedure arising during the progress of the cause, and because of the conclusion we reach need not be discussed. Those which are determinative of the controversy involve the questions:

(1) Whether the complainants had, upon the allegations in their bill, a full, adequate, and complete remedy at law. Whether they could have secured complete relief in the action at law brought by defendant against them.

(2) Whether the allegations of fraud in the bill were of such matters and of such character, in view of the written contract of April 18, 1901, as could be made the basis for cancellation.

(3) Whether, upon the evidence, the complainants have established their allegations of fraud.

The opinion of the learned judge was against defendant upon each of these questions.

Without undertaking to enter into any discussion of the defenses open to complainants in the action at law, either under the system of pleading at common law, or as modified by Code Va. 1904, § 3299, we concur with the learned judge below that complainants could not, in that action, have the complete, full, and adequate remedy to which they would be entitled, if the allegations in their bill are true.

Section 3299, Code Va., provides:

"In any action on a contract, the defendant may file a plea alleging any such failure in the consideration of the contract, or fraud in its procurement,

or any such breach of any warranty to him of the title or the soundness of personal property, for the price or value whereof he entered into the contract, or any other matter as would entitle him either to recover damages at law from the plaintiff, or the person under whom the plaintiff claims, or to relief in equity, in whole or in part, against the obligation of the contract; or if the contract be by deed, alleging any such matter arising under the contract, existing before its execution, or any such mistake therein, or in the execution thereof, or any such other matter as would entitle him to such relief in equity; and in either case alleging the amount to which he is entitled by reason of the matters contained in the plea. Every such plea shall be verified by affidavit."

Conceding pro hac vice that complainants, under this statute, could defend in the action at law by showing fraud in the procurement of the execution of the contract, it does not follow that the jurisdiction of equity is ousted. If, in truth, there was such fraud in the procurement of the contract as entitled complainant to cancellation, it is clear that a court of law could not grant the relief—that is peculiarly and solely within the power of a court of equity.

We concur with the contention of complainants that:

"Even under the Virginia statute (Code 1904, § 3299), upon an equitable plea, such as there provided for, as a defense to an action at law, the court would have no power to rescind the contract, even though it were found to be fraudulent. Only a court of equity would have such power. Hence a defense at law to the suit instituted by Dotson would have not been adequate and complete."

Mr. Chief Justice Fuller, in Kilbourn v. Sunderland, 130 U. S. 505, 9 Sup. Ct. 594, 32 L. Ed. 1005, says:

"The jurisdiction in equity attaches unless the legal remedy, both in respect to the final relief and the mode of obtaining it, is as efficient as the remedy which equity would confer under the same circumstances."

Farwell v. Colonial Trust Co., 147 Fed. 480, 78 C. C. A. 22, was a suit for cancellation for fraud. Sanborn, Circuit Judge, said:

"The defendants challenge the bill on the ground that the complainant has an adequate remedy at law by an action to recover of the trust companies the price he paid for his bonds and stock or the damages which have resulted to him from the false representation he avers. But the adequate remedy at law which will deprive a court of equity of jurisdiction is a remedy as certain, complete, prompt, and efficient to attain the ends of justice, as the remedy in equity." Rumbarger v. Yokum (C. C.) 174 Fed. 55.

This, we think, is in accordance with well-settled principles of equity jurisprudence.

We proceed to inquire whether the bill sets forth allegations entitling complainants, or the evidence sustains, the prayer for cancellation. We do not understand that the learned judge admitted parol evidence to contradict, alter, or add to the written contract. The bill, while containing much irrelevant and some redundant matter, is not drawn upon the theory that the contract fails to express the terms of the agreement as settled after negotiation between the parties—it is not drawn with a view to correction. It concedes that the written contract expresses the agreement made between the parties, but avers that complainants were induced to execute it, i. e., concur in its terms and provisions by false and fraudulent representations of material facts. The equitable doctrine concerning cancellation is well defined by the

Court of Appeals of Virginia, in Campbell v. Building & Loan Association, 98 Va. 729, 37 S. E. 350:

"A misrepresentation, the falsity of which will afford a ground of action for damages, or a bill for the rescission of a contract, must be as to an existing fact. It must be an affirmative statement of some facts, in contradistinction to a mere expression of an opinion, which is ordinarily not presumed to deceive or mislead."

In Farrar v. Churchill, 135 U. S. 609, 615, 10 Sup. Ct. 771, 773 (34 L. Ed. 246), Mr. Chief Justice Fuller says:

"The representation must be in regard to a material fact, must be false, and must be acted upon by the other party in ignorance of its falsity and with a reasonable belief that it was true. It must be the very ground on which the transaction took place, although it is not necessary that it should have been the sole cause, if it were proximate, immediate, and material. If the purchaser investigates for himself and nothing is done to prevent his investigation from being as full as he chooses, he cannot say that he relied on the vendor's representation."

The Chief Justice quotes with approval the language of Lord Langdale in Clapham v. Shillito, 7 Beaven, 146:

"If the party to whom the representations were made himself resorted to the proper means of verification before he entered into the contract, it may appear that he relied upon the result of his own investigation and inquiry, and not upon the representations made to him by the other party; or if the means of investigation and verification be at hand, and the attention of the party receiving the representation be drawn to them, the circumstances of the case may be such as to make it incumbent on a court of justice to impute to him a knowledge of the result which, upon due inquiry, he ought to have obtained, and, thus the notion of reliance on the representations made to him may be excluded."

In Shappirio v. Goldberg, 192 U. S. 232, 240, 24 Sup. Ct. 259, 261 (48 L. Ed. 419), Mr. Justice Day says:

"When the means of knowledge are open and at hand, or furnished to the purchaser, or his agent, and no effort is made to prevent the party from using them, and especially when the purchaser undertakes examination for himself, he will not be heard to say that he has been deceived to his injury by the misrepresentations of the vendor."

In Farnsworth v. Duffner, 142 U. S. 43, 12 Sup. Ct. 164, 35 L. Ed. 931, Mr. Justice Brewer cites with approval Luddington v. Renick, 7 W. Va. 273, wherein it is said:

"A party seeking the rescission of a contract, on the ground of misrepresentations, must establish the same by clear and irrefragable evidence, and if it appears that he has resorted to the proper means of verification, so as to show that he, in fact, relied upon his own inquiries, or if the means of investigations were at hand, and his attention drawn to them, relief will be denied. * * * If the neglect to make reasonable examination would preclude a party from rescinding a contract on the ground of false and fraudulent representations, a fortiori is he precluded when it appears that he did make such examination, and did not rely upon the representations."

Judge Sanborn, in Farwell v. Colonial Trust Co., supra, says:

"Actual or legal fraud is an essential element of those misstatements which will induce a court of equity to set aside a contract or a sale. The subject of such misrepresentations must be the existence or nonexistence of facts at the time the statements were made. Neither promises, nor prophecies, nor expressed opinions or beliefs, concerning future events or conditions, will

sustain a rescission of a contract or a sale. The facts concerning which the misrepresentations are made must be material to the contract, or transaction. They must be facts concerning which the victim is ignorant, and of which a person of ordinary segacity and diligence in his place would have acquired no knowledge. The false statements or representations must be well calculated to deceive and to induce the victim to enter upon the trade, and they must accomplish the result and cause him substantial damages."

These authorities are in harmony with equitable principles and are sustained by a uniform current of decisions of courts of equity.

Eliminating much of the redundant language of the bill, the material averments come substantially to the following: That defendant's agents represented that he owned, or controlled, large bodies of white oak timber on contiguous tracts of land, about 8 miles wide and 12 miles long. That among other tracts so owned or controlled by defendant were the "Mullins," "Chase" and "Ramey Flats" timber, of special value and convenient location. That these tracts were pointed out to complainants, and represented as the timber which they were to get under the contract. That defendant could procure, with good title, a sufficient number of trees, including those named, to make in all 50,000 of the kind and description mentioned and desired, etc., and that these representations were made as an inducement to the execution of the contract—that they were false and fraudulent.

Before discussing the evidence, it will be well to examine the language of the contract. It will be observed that it opens with the declaration:

"That the parties of the second part have made personal investigation of the white oak timber in Dickenson county, Va., on the waters of Pound river and its tributaries and McClure river and its tributaries and Crane's Nest river and its tributaries, as to the quality of said timber, its location, facilities as to cutting and getting the same to railroad, etc., and are satisfied with said investigation, etc."

Complainants, in their bill say that by "personal investigations" they meant investigation based upon representations and statements made by Dotson and his agents. It will be noted that defendant does not, in said contract, sell or convey to complainants a single tree, nor does he represent that he owns or controls a tree, but he "agrees to procure and to sell to said second parties, and said second parties agree to purchase from said first party, 50,000 white oak trees," of the dimensions set out; "it being understood, however, by and between the parties to this contract, that said number of 50,000 trees is only an estimate of the number of trees that the said first party thinks he will be able to procure and deliver to said second party as aforesaid." To preclude any suggestion of liability by reason of his failure to procure the entire number named, it is provided that:

"If it should be found that, when said trees are received and counted by the said second parties, the number of trees that the said first party has procured, or caused to be conveyed by the parties on whose land said trees stand, or the owners of said trees, * * * is less than 50,000, then said second parties are to be required to take and pay for the actual number of trees, said first party has procured and caused to be delivered to said second parties, as aforesaid, and said second parties shall have no claim against said first party, by reason of his failure to procure and cause to be conveyed to said second parties the whole of the said 50,000 trees."

This language is inconsistent with the idea that defendant made any representation as to the actual number of trees which he was to procure and cause to be conveyed and expressly negatives the suggestion that he was selling, or contracting to sell, trees then "owned or controlled" by him. The only obligation which he assumed was to make an honest effort, in good faith, to "procure and cause to be conveyed" to the complainants the number of trees named, of the kind and description set forth "in Dickenson county, on the waters of Pound river and its tributaries, McClure river and its tributaries, and Crane's Nest river and its tributaries." There is no suggestion in the contract that any specified tract of timber land was to be "procured" by defendant. To write into it an agreement to "procure" the "Mullins" and "Chase" tracts, or the "Ramey Flats" timber, or that the trees were to be on "contiguous tracts," or in a body of certain dimensions, would be to add to, vary, and change the contract, as made by the parties, thus violating an elementary rule of evidence binding upon courts of equity in suits for cancellation. If it were alleged, and proven, that these facts were agreed upon, that the parties intended to insert them in the written contract, and that they were omitted by the mistake of the draughtsman, or by the fraud of defendant, an equity would be found for a decree to correct the instrument and make it speak the truth. There is no suggestion, either in the bill or the evidence, that the written contract was not drawn and executed in the language agreed upon by the parties, or did not express their agreement. The evidence shows that its terms were fully discussed and concessions made to complainants. It is said by complainants that they were induced to enter into the contract as written, because defendant's agents showed them certain tracts of land upon which white oak timber was growing and standing and told them that defendant "owned or controlled" these tracts, and that they would "get" this timber, etc.

Assuming, for the purpose of this discussion, that the allegations were of the character entitling complainants to cancellation, we proceed to examine the evidence and ascertain whether they are sustained. It seems that, prior to executing the contract, complainant Chas. M. Kirk made a trip over the land upon which the timber stood, in regard to which they were negotiating, with Col. Thompkins, defendant's agent; defendant furnishing a guide. He says that Col. Thompkins and Mr. Dean, the guide, showed him certain timber which he understood to be "the Chase and Mullins tracts and the Ramey Flats timber and another piece that we afterwards branded—these four tracts were the only ones which were shown on this trip." He says that the four pieces of timber, above mentioned, were shown him with the representation that the entire body of timber to be furnished would be as good in quality, and as well located as to the lay of the land as this, and that it would lay in a body about 8 by 12 miles, and that the nearest point of the timber to a proposed tunnel and railroad extension would not be more than 2½ miles, and the extreme point not more than 15 miles from said tunnel. He says that these statements were relied upon by him and constituted his only "source of in-

formation in regard to the location, boundary, and nearness to an extension of the railroad." He further says that they were given fully to understand before buying, and during the examination, that Mr. Dotson owned all of the timber that would be furnished—a large part of it in fee and the balance in timber right only. These representations, he says, were made in February, 1901. The contract was executed April 18, 1901. Mr. Dean was examined as a witness for defendant and gives a very clear statement in regard to the timber which he showed Mr. Kirk on the first trip—the route taken, etc. He says that he made no such representations as testified to by Mr. Kirk, saying:

"I did not know what timber they would get—at that time; I did not know where the Mullins timber was, or the Chase timber. I did not know it from any other timber."

Asked if he represented that complainants would get the timber in a "solid body," he answered:

"No, sir; I never heard such a thing mentioned."

Col. Thompkins was not examined.

On the second trip, Louis Walker, a timber dealer from Ohio, was sent by complainants. He went with Col. Thompkins to see defendant, who furnished him a horse and Mr. Dean as a guide. Dean was compelled to leave after the first day, by reason of the illness of his father, and Mr. McFalls accompanied them. Mr. Walker testifies: That he was shown a large body of timber, giving a detailed account of the trip and the boundaries over which he was carried. He says that Thompkins and McFalls stated that the timber lay in a body 12 by 8 miles. That Thompkins said that Dotson owned all of the timber; that he did not own the land, but bought the timber and had a right to sell it and take it away; that the right of way went with it. "All this body of timber that he showed me was controlled by Mr. Dotson. That was the understanding and inference I got from what he said." He says that Mr. McFalls called one tract the "Fulton Tract," others the "Ramey Flats," "Chase," etc., and these were tracts which complainants were to get. He further says that, when they saw Mr. Dotson, Col. Thompkins said:

"I have shown Mr. Walker this timber. I have given him the terms upon which you propose to sell this timber to these parties, and I will now repeat what I told Mr. Walker."

He went over the proposition, as he understood it, and asked Mr. Dotson to correct him, if he made any mistake or misstatement, and after he had made the statement Mr. Dotson said:

"That is just what I propose to do exactly."

Dotson said:

"He controlled or could sell the timber."

The different tracts were mentioned, and it was said that they were fair samples, etc. This witness says: That he was sent by complainants to examine the "location and whether it was a class of timber that would be desirable, etc." That the right of way was "one of the main

things" he desired to find out about. That Dotson said that "in the deed he was going to make us—a deed for the timber—and in that deed he would guarantee us a right of way to all."

A third trip of investigation was made by complainants John C. Leavitt, Chas. M. Kirk, John C. Jackson, and James McKelvey, on April 3, 1901. Defendant sent with them, as a guide, his brother-in-law, W. F. Clay, who took them to the home of McFalls; that he showed them the timber. They were out on the trip several days. Jackson says that they were shown the several tracts, especially in controversy, and told them what they would get, "that the timber was to be a solid block," and that Dotson "owned and controlled these certain tracts." Leavitt says that they were shown the Ramey flats, the Mullins, and particularly the Chase tracts. "We measured up timber in at least two of these tracts. Got off our horses and went into the timber and looked certain portions of each tract over carefully. Took a tapeline and measured the trees, and I know that there were some mammoth trees in several of the tracts, particularly the Chase tract." These tracts were pointed out as either owned or controlled by Dotson and "would represent the greater part of the timber which would come under the contract"—"as I understand it." He says that the contract was written on Monday following Saturday upon which they returned from the "tour of inspection." He says, "We were very well pleased with the timber and ready to enter into the contract"; that "they had traveled around the timber 50 or 60 miles."

Mr. McFalls was introduced for defendant and gave an account of the several trips upon which he accompanied the parties inspecting the timber. He denied that he told them that Dotson owned the timber, saying, "If he owned it, I don't know it." They asked him who owned the timber, and he told them as "nigh" as he could; that he told Mr. Kirk that "Old man Mullins owned the Mullins timber," and that "the Chases owned the Chase timber." "I supposed" that Dotson owned or claimed that he had a contract on the Fulton tract. When asked whether he told them that the entire body of timber would be as good as the Mullins, Chase, Ramey flats, and Fulton tracts, and that the timber would lay in a body 8 by 12 miles and its location with reference to the railroad, he answered:

"I never did name no such thing as that and never thought of such a thing. It was never talked of by me nor them—neither. I never heard Col. Thompkins make any such representation. I was not round making any such statement—I was just to show up the timber of the country, an average of the country. They asked me this about the Chase timber, if it could be bought, and I told them that he had a certain price on it. I will tell you just how it was; that he asked a certain price for it, and Mr. Dotson told me if he would take that price, and I think that was $20."

He denies telling Walker that Dotson owned the timber. Dotson was examined in his own behalf and denied that he ever represented or authorized any one to represent that he owned the timber or agreed that any specified tracts were to be procured. His testimony is full and explicit. The contract was drawn some two months after the first tour of inspection, and two days after the last. Hence it appears that the complainants had ample time and opportunity to inspect the

timber, and that the last inspection was made immediately prior to the consummation of the trade. In addition to the positive denial by Dean, McFalls, and Clay, of complainants' testimony, in regard to the alleged representations that Dotson owned the Chase, Mullins, or Ramey flats, the language of the contract expressly excludes any such contention. It is quite impossible to reconcile this language with the testimony of complainants. Again, they testify that they relied upon these alleged representations; whereas, in the contract, they expressly declare that they have made "personal investigation," as to the quality, location, and facilities for getting it out to the railroad, "and are satisfied from said investigation." This language solemnly inserted in the contract contradicts the contention now made.

It will be further noted that any suggestion that Dotson assumed any obligation to do more than make an honest effort, in good faith, to "procure and have conveyed" to complainants the number of trees called for, is met by the express provision that if he should not succeed in getting the entire quantity he should not be liable to complainants; but, on the contrary, they shall receive and pay for such trees as he does procure and have conveyed to them. The complainants take upon themselves the burden of proving that the representations were made, as alleged; that they were false and fraudulent—that is, that defendant knew they were untrue—that they were material inducements to making the contracts; and that they were deceived by them.

Upon a careful examination of the testimony, only excerpts from which it is possible to give, we are confronted with the inquiry whether they have successfully carried this burden and established their case. The rule by which courts of equity are guided in dealing with cases of this character is well settled. In Atlantic Delaine Co. v. James, 94 U. S. 207, 24 L. Ed. 112, it is said:

"Canceling an executed contract is an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear; never for alleged false representations unless their falsity is certainly proved and unless the complainants have been deceived and injured by them."

Chancellor Kent says that an instrument should not be canceled for alleged fraud unless shown "to the entire satisfaction of the court." Lyman v. United Ins. Co., 2 Johns. Ch. (N. Y.) 632. Mr. Justice Brewer quotes with approval the following language of Mr. Justice Miller:

"We take the general doctrine to be that when, in a court of equity, it is proposed to set aside, to annul, or correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal and convincing, and that it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt."

In Gumaer v. Col. Oil Co., 152 U. S. 88, 14 Sup. Ct. 480, 38 L. Ed. 365, the bill was dismissed because the court "could not reconcile the conflicting testimony of the witnesses." Applying this well-established standard based upon experience and sound policy, we are unable to find that the complainants have shown that they were induced to execute the contract of April 18, 1901, by the false and fraudulent

representations of defendant or his agents. While this conclusion works a dismissal of the bill, its correctness is sustained by the conduct of the parties, after the contract was executed. It appears that all parties entered at once upon the performance of the obligations assumed by them. A large number, some 17,600 trees, were marked, branded, and received by complainants. When complaint was made that defendant was not procuring the trees which complainants claimed they were to get, Dotson said he was getting the timber—he did get the Ramey flats, the Fulton, and several other tracts. Mr. Kirk says:

"The only things we felt we were misled in was that the right of way for the removal of the timber would have been vastly simpler for us to have had Mr. Dotson's own land that the timber stood on, the land adjoining it, over which it would have had to be moved. We had the impression that that would have been a very small matter, the question of the right of way, as we understood that he owned nearly all the land—the territory over which this territory extended."

Dotson says that, if complainants had not abandoned the contract, he would have secured the full number of trees named in it; that he was, at the time, engaged in doing so.

There was considerable evidence tending to show that Dotson was buying the timber, and that he was paying much less for it than the price for which he had sold it to complainants. That they complained of this, and that it was on this account that they abandoned the contract and left the state. This testimony is material only as tending to explain the conduct of the parties after the execution of the contract.

Without further extending the discussion, we are of the opinion that the evidence fails to show that any fraud was practiced on complainants, in the negotiation which led up to the execution of the contract. If in the action at law they can show that defendant has not, in good faith, endeavored to procure the timber, or that the title to any of that conveyed to them is defective, or that he has, in any other respect, failed to perform and discharge the obligation imposed upon him by the contract, it is open to them to do so, either by way of defense or by way of counterclaim, under the provisions of section 3304 of the Code of Virginia, which provides that:

"If the plaintiff be a person with whom the contract sued on was originally made, or the personal representative of such person, on the trial of the case, the jury shall ascertain the amount to which the defendant is entitled and apply it as a set off against the plaintiff's demand, and if the said amount be more than the plaintiff is entitled to, shall ascertain the excess, and fix the time from which interest is to be computed on the same, or any part thereof. Judgment, in such case, shall be for the defendant against the plaintiff for said excess, with such interest from the said time till payment."

We concur in the following language found in defendant's brief:

"Offsets and counterclaims of a legal character may be availed of by the defendant in an action at law in the federal courts, if allowed by state practice, and even to the extent of enabling the defendant to recover judgment against the plaintiff in the action." Dabney, Fed. Jur. § 117, p. 164; Partridge v. Insurance Co., 15 Wall. 573, 580, 21 L. Ed. 229.

See, also, Bostwick v. Covell (C. C.) 24 Fed. 402; Withers v. Greene, 9 How. 213, 231, 13 L. Ed. 109.

In Newport News, etc., R. Co. v. Bickford, 105 Va. 182, 52 S. E. 1011, a recent case, it was held as follows:

"Section 3299 of the Code contemplates the settlement of all differences that are connected with the subject-matter of the plaintiff's claim. The fact that the defendant's claim is in tort or for unliquidated damages is immaterial. If it is based upon matters directly connected with, and injuries growing out of, the contract sued on by the plaintiff, it can be asserted as a set-off under section 3299. The object of the section is to prevent one cause of action from being divided into two, and to give precisely the same relief on a plea filed thereunder as could be obtained in an independent action brought for the same cause."

In this way the controverted questions of fact may be tried by a jury, and the rights of all parties ascertained and enforced. If it be found that defendant has failed to procure trees in accordance with the terms of the contract to the value of $5,000, the cash payment, or that complainants have sustained other damages, by reason of a breach of the contract on the part of defendant, they will recover such amount as a jury may find to be due. The cause will be remanded to the Circuit Court for the Western District of Virginia, with direction to dismiss the bill.

Reversed.